A99A2319. GLISSON v. FREEMAN.
A99A2480. GLISSON v. MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.
(532 SE2d 442)

RUFFIN, Judge.

Deloris Glisson sued Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) and Carol Freeman, the executor of her late husband's estate, asserting numerous claims relating to a joint brokerage account Glisson and her husband maintained at Merrill Lynch. Glisson asserted that Merrill Lynch improperly transferred funds from that account to another account maintained by the estate. The trial court granted summary judgment to Merrill Lynch and Freeman, and Glisson appeals.[1] For reasons discussed below, we affirm in part and reverse in part the grant of summary judgment to Merrill Lynch and reverse the grant of summary judgment to Freeman.

To prevail at summary judgment, the moving party must show that

> there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. . . . A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden,

---

[1] Glisson also asserted claims against several other defendants, but these claims are not at issue on appeal.

the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. OCGA § 9-11-56 (e).[2]

Many of the essential facts in this case are hotly disputed, and for purposes of summary judgment, the facts must be viewed in the light most favorable to appellant. In August 1994, appellant and her husband, Theodore Glisson, established a brokerage account with Merrill Lynch. This account (the Joint Account) was a joint account with right of survivorship. The account opening documents, signed by appellant and her husband, expressly state that "[i]n the event of the death of any of the undersigned, the entire interest in the joint account shall be vested in the survivor/s, and the estate of the deceased shall have no further interest therein." At the time of Theodore Glisson's death on January 27, 1997, there was approximately $247,000 in the Joint Account. Craig Miller was the Merrill Lynch broker responsible for servicing the Joint Account.

Theodore Glisson's will designated Freeman, his daughter from an earlier marriage, as executor of his estate. The will did not mention the Joint Account but directed that substantially all of Theodore Glisson's assets be placed in a testamentary trust, with appellant, who was 65 years old, as lifetime beneficiary and Freeman and another individual as co-trustees. The trustees were directed to invest the assets with Merrill Lynch, which in turn was required to invest the assets only in government or corporate bonds, certificates of deposit, or money market accounts. The trustees were authorized to withdraw funds from the trust in an amount sufficient for the support of appellant, who was required to submit an annual budget to the trustees. Upon appellant's death, the trust assets were to be distributed to Freeman, her brother Ted Glisson, and certain other named individuals. Miller testified that, before Theodore Glisson died, he told Miller that he was going to create a trust and place all his assets in it. Miller interpreted that statement to include all assets invested with Merrill Lynch.

On February 4, 1997, Freeman and Ted Glisson met with Miller at Merrill Lynch's office and showed him a copy of Theodore Glisson's will. Miller had never met Freeman before this point. Miller testified that he informed them that, because the Joint Account was a joint account with right of survivorship, it was appellant's property and he could not accept any instructions from the estate regarding transfer of assets from the Joint Account. Freeman, however, denied that Miller mentioned the survivorship features of the Joint Account.

---

[2] (Emphasis in original.) *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

According to Miller, Freeman indicated that appellant desired to transfer the funds from the Joint Account into the estate account and asked what would be necessary to effect such a transfer. Ted Glisson, however, denied that he or Freeman ever asked Miller to transfer funds from the Joint Account to the estate account. Miller testified that he told them he would need appellant's written authorization for such a transfer and gave Freeman a blank letter of authorization[3] and affidavit of domicile to be filled out by appellant.[4] Freeman and Ted Glisson, on the other hand, testified that Miller simply explained that the two documents were needed to set up the estate account. Freeman testified that she did not understand that the funds in the Joint Account became appellant's property upon Theodore Glisson's death. Miller said at the meeting that Theodore Glisson's intent was for all of his assets to go into the estate trust.

Ted Glisson subsequently returned to Merrill Lynch with the letter of authorization and affidavit of domicile, both purportedly signed by appellant but otherwise blank, and left the documents with a secretary. After he received the documents, Miller had his administrative assistant, Patsy Davis, complete the letter of authorization by writing the relevant account numbers and other information in the blanks above appellant's signature.[5] When completed, the letter of authorization, which was dated March 26, 1997, purported to authorize the transfer of assets from the Joint Account into an estate account. Miller never contacted appellant, however, to confirm that he had her permission to complete the form in such manner or to transfer the funds into the estate account. Instead, Miller apparently relied upon the alleged representations by Freeman, as well as his own understanding of Theodore Glisson's intent. Moreover, Miller testified that he did not remember ever seeing the letter after it was completed. Miller also testified that the affidavit of domicile, which was necessary to complete the transfer, was improper because it was not notarized.

In the course of attempting to effectuate the transfer, Davis

---

[3] The blank letter of authorization was addressed to Merrill Lynch and read as follows: "Dear Sir or Madam: This is your authority to transfer [blank] from account number(s) [blank] in the name of [blank] to account number(s) [blank] in the name of [blank]. Very truly yours, [blank]."

[4] Miller stated that the affidavit of domicile, which identified the states where the deceased filed his last tax return and died, was required by Merrill Lynch policy, although he did not know why.

[5] Davis testified that she did not recall whether the letter of authorization had already been signed when she filled in the account information. However, Miller testified that he provided a blank form to Freeman and Ted Glisson, and they testified that the document was blank at the time it was signed. The record contains a copy of a blank letter of authorization purportedly signed by appellant, and the signature appears to correspond exactly to that on the document filled in by Davis.

apparently learned that Merrill Lynch policy precluded the transfer of funds directly from a survivorship account into an estate account. Instead, the funds had to be first transferred into an individual account in the name of the survivor, and then transferred from that account into the estate account. Accordingly, at Miller's request, Davis prepared two additional letters of authorization — the first authorizing transfer of the funds from the Joint Account into a new account in appellant's name, and the second authorizing transfer of the funds from that account into the estate account. The first letter bears a typewritten date of April 2, 1997, and the second appears to bear a handwritten date of April 9, 1997. Both documents contain what purports to be appellant's signature. Merrill Lynch ultimately transferred the funds from the Joint Account into the estate account pursuant to these two documents.

The evidence is conflicting regarding the signing of the various letters of authorization. Freeman and Ted Glisson testified that, at some point after receiving the blank documents from Miller, they went to appellant's house to obtain her signature. Ted Glisson testified that this occurred the same day as his meeting with Miller — i.e., February 4. Freeman, however, could not remember when this occurred, although she was sure that it was not in January or February. Ted Glisson testified that he believed the purpose of the documents was simply to set up an estate account. He and Freeman testified that appellant signed the documents in the presence of Freeman, Ted Glisson, and appellant's daughter, Becky Rawlins. According to Freeman,

> I told her that I had some paperwork that needed to be signed, that needed her signature, that was to be returned to Merrill Lynch so that I could set up the trust account in the name of the estate for daddy's estate, to be in compliance with the will.

Freeman did not, however, explain to appellant that the letter of authorization would be used to transfer assets from the Joint Account to the estate account. Freeman testified that, after appellant signed the documents, she gave them to Ted Glisson in an envelope to be delivered to Merrill Lynch. Ted Glisson, however, testified that the documents were not in an envelope when Freeman gave them to him.

Appellant and Rawlins both denied that Freeman and Ted Glisson brought the letter of authorization and affidavit of domicile to be signed by appellant, and appellant testified that she never had any conversations with Freeman or Ted Glisson regarding the letter of authorization. She testified that she never spoke with Freeman

about transferring funds from the Joint Account and denied knowingly signing the letter or affidavit. She testified that Freeman and Ted Glisson did bring over a stack of papers for her to sign one day but claimed that Freeman explained they were tax documents. Appellant said that the top document appeared to be some type of tax form. Freeman never informed appellant that any of the documents would be used to transfer funds from the Joint Account or for any purpose other than taxes. Ted Glisson denied that he ever went to appellant's house to have her sign any tax documents and testified that the only two documents he and Freeman brought to appellant were the letter of authorization and affidavit of domicile.

With respect to the two letters of authorization prepared by Davis in April 1997, the evidence is perhaps even less clear. Although Davis testified that she prepared these two letters of authorization at Miller's request, there is no evidence that they were actually sent to appellant for her signature, nor is there any evidence as to how they were signed or returned to Merrill Lynch. Davis testified that she did not remember what she did with the documents after preparing them. She did not recall mailing them to appellant or anyone else, nor did she recall giving them to Miller. Although she said that Miller was the one who would have instructed her on where to send the documents, she had no recollection of Miller ever giving her any directions. Miller also did not know what happened to the documents after they were prepared, although he knew that he did not give them to Freeman or Ted Glisson. In fact, he testified that he had never seen the documents prior to this litigation. Merrill Lynch produced no documentation, such as a cover letter, indicating that the documents were ever mailed to appellant or anyone else. Davis said that the documents somehow ended up on her desk and that she effected the transfer of funds pursuant to the documents, but she did not know how the documents came to be on her desk. Appellant denied that she ever signed the two documents and testified that she had not received them in the mail or ever seen them before. Freeman and Ted Glisson both testified that they had never seen the two documents. A handwriting expert retained by appellant testified that, in his opinion, the purported signatures of appellant on the two documents were forgeries. The expert could not be sure whether the signature on the March 26, 1997 letter of authorization was forged, perhaps because Merrill Lynch was unable to locate the original.

In addition to the controversy regarding appellant's purported signature, there was also evidence that Freeman's signature was forged on a document. For an unexplained reason, Merrill Lynch prepared an affidavit of domicile which was purportedly signed by Freeman and notarized by Rosalyn Denmark, a Merrill Lynch adminis-

trative assistant.[6] Freeman denied that she ever signed the document. Denmark, the notary, admitted in her deposition that she did not see Freeman sign the document. She testified that she notarized it at the request of Davis, who told her that it was needed "for the client's estate." Denmark testified that on occasion she notarizes documents for Merrill Lynch even though she has not witnessed the signature. In her deposition, Davis admitted that she had not seen Freeman sign the document.

It is undisputed that Miller never contacted appellant to confirm that she desired to transfer the funds from the Joint Account to the estate account. All parties agree that, at some point after her husband's death, appellant went to Merrill Lynch's offices with her daughter, Rawlins, to drop off a death certificate.[7] However, the parties disagree as to what transpired during this visit. According to Miller,

> I explained to her that we need to go into my office and review everything that's been done. And she made the comment to me . . . that that was okay basically, and then I almost insisted that she come in to review everything, and she said Carol [Freeman] is handling it, and that they have to go, or they're going to lunch or going somewhere.

In her deposition, however, appellant said that she did not recall ever saying that Freeman was taking care of anything. She testified that Miller simply invited her and her daughter to sit down but denied that he asked if she would like to "[t]alk about things." In a subsequent affidavit, appellant specifically denied saying words to the effect of "Carol's handling all that," stating that "[n]o subject came up in conversation to which I would have said that." Rawlins testified in her affidavit that the meeting was brief and that the parties "merely exchanged pleasantries." She stated that

> [n]o mention was made of an account nor did Mr. Miller mention or even hint that he desired to confer with [appellant] about any "matters" or "things," and there was no mention of estate matters, joint accounts, or any other discussion. He merely asked us if we would like to have a seat. We declined as we did not have an appointment and had come only to drop off the death certificates.

---

[6] Miller suggested that the document should have been signed by appellant.

[7] In his affidavit, Miller claimed that this visit occurred "shortly" after his February 4 meeting with Freeman. In his deposition, however, Miller testified that it was about a month after Theodore Glisson's death on January 27.

Appellant's attorney, Raymond Dickey, testified that he contacted Miller about the Joint Account after appellant showed him an account statement she had received with the initials "JTWROS." Dickey spoke with Miller, who told him that the funds in the Joint Account had been transferred to another account. Dickey said Miller told him that appellant had come into his office on March 26 and signed a document authorizing the transfer. When Dickey asked where the funds had been transferred to, Miller told him he would need to speak to the legal department. Dickey then spoke with appellant, who became very upset and denied signing any such document. Miller testified that Dickey asked him to reverse the transfer and that he told Dickey he could not do that.

Because Dickey had also represented the estate, he withdrew from any further representation of appellant. On April 25, 1997, appellant's new attorney wrote a letter to Merrill Lynch stating that the Joint Account became appellant's property upon her husband's death and demanding a record of all transactions relating to the account. On September 5, 1997, after Merrill Lynch refused to reverse the transfer, appellant filed suit against Merrill Lynch, Freeman, and others. The complaint was later amended to add additional counts. In the amended complaint, appellant asserted claims of conversion and breach of fiduciary duty against Merrill Lynch and asserted claims of fraud, theft by deception, breach of fiduciary duty, and negligent misrepresentation against Freeman. In addition, she asserted a claim of conspiracy to defraud against Merrill Lynch and Freeman. She also sought punitive damages and attorney fees and expenses from all defendants. In its answer, and in two separate pleadings accompanying the answer, Merrill Lynch sought to interplead the funds that were maintained in the estate account.

On January 26, 1998, the trial court entered a consent order requiring Merrill Lynch to transfer the funds from the estate account into a new cash management account, with no withdrawals permitted except by order of the court. On May 20, 1999, the trial court granted summary judgment to Merrill Lynch and Freeman. The court also entered an order granting Merrill Lynch's interpleader motion and discharging it from liabilities relating to the cash management account upon the same being deposited with the court.

## Case No. A99A2480

1. Appellant contends that the trial court erred in granting summary judgment to Merrill Lynch on her claims of negligence and breach of fiduciary duty.[8] For reasons discussed below, we agree.[9]

---

[8] Appellant's amended complaint did not specifically assert a negligence claim against

Appellant's fiduciary duty and negligence claims are both based in part on Merrill Lynch's failure to take proper steps to ensure that it had appellant's authorization to transfer funds from the Joint Account into the estate account. We have held that

> [a] stockbroker's duty to account to its customer is fiduciary in nature, so that the broker is obligated to exercise the utmost good faith. Requirements of good faith demand that in the principal's interest it is the agent's duty to make known to the principal all material facts which concern the transactions and subject matter of his agency.[10]

In considering the extent of a broker's duty to its client, federal cases have drawn a distinction between discretionary and nondiscretionary accounts. In a discretionary account, the broker is authorized to carry out transactions on behalf of its client without prior authorization, while in a nondiscretionary account the broker is only authorized to transact business after receiving authorization from the client.[11] With respect to a nondiscretionary account, such as the Joint Account, the broker owes a number of duties to the client, including the duty to transact business only after receiving prior authorization from the client and the duty not to misrepresent any fact material to the transaction.[12]

In granting summary judgment to Merrill Lynch, the trial court reasoned that (1) because Freeman was executor of Theodore Glisson's estate, Merrill Lynch was justified in relying on her representations, (2) Merrill Lynch was justified in relying on the transfer documents because there is no evidence it had knowledge of any alleged forgeries, (3) Miller was justified in relying on appellant's alleged statement that "Carol is handling all of that," and (4) Merrill Lynch immediately interpleaded the funds in its possession as soon as it learned of the controversy. The trial court erred with respect to each of these grounds for its decision.

Although Freeman was the executor of Theodore Glisson's estate,

---

Merrill Lynch, although it did allege that its employee, Miller, was negligent in failing to obtain appellant's authorization. Merrill Lynch does not argue that the complaint failed to properly state a claim for negligence against it and indeed concedes that the complaint stated such a claim.

[9] Merrill Lynch's motion to strike appellant's brief for using an improper font is hereby denied.

[10] (Citations and punctuation omitted.) *Minor v. E. F. Hutton & Co.*, 200 Ga. App. 645, 647 (3) (409 SE2d 262) (1991). See also *E. F. Hutton & Co. v. Weeks*, 166 Ga. App. 443, 445 (1) (304 SE2d 420) (1983).

[11] See *Merrill Lynch &c. v. Cheng*, 901 F2d 1124, 1127-1128 (D.C. Cir. 1990); *Leib v. Merrill Lynch &c.*, 461 FSupp. 951, 952-953 (E.D. Mich. 1978).

[12] See *Cheng*, supra; *Leib*, supra.

Miller admits that the funds in the Joint Account became appellant's property upon her husband's death pursuant to the account's survivorship provisions.[13] If the estate had no interest in the account, we fail to see how Miller would be justified in relying on Freeman's statements simply because she was executor. Indeed, Freeman's interest as executor of the estate and as co-trustee and residual beneficiary of the testamentary trust is clearly antagonistic to appellant's interests. Freeman would personally benefit from having the funds transferred into the estate account, since she could control the disbursements under the trust and would be entitled to a portion of the trust funds upon appellant's death. Thus, Freeman's status as executor and co-trustee should have given Miller less, not more, reason to believe her self-serving representations as to appellant's intent. Miller himself admitted in his deposition that appellant was his client, not the estate. Gloria Padgett, a Merrill Lynch service manager, testified that it is Merrill Lynch policy "to deal with strictly the client in question," and not to generate a letter of authorization based on a representation by a third party. The self-evident reason for such a policy is to avoid the situation presented in this case.

With respect to the second basis for the trial court's decision, Merrill Lynch did not receive from appellant or anyone else a signed document authorizing transfer of the assets. What it received was a completely blank form with appellant's purported signature, which Miller proceeded to have filled out without ever contacting his client. Davis testified that, in her 11 years at Merrill Lynch, she had never before seen an authorization letter signed in blank. When delivered to Merrill Lynch, the form was not accompanied by any letter or other document instructing Merrill Lynch as to how the blanks should be completed. The document was not even delivered to Merrill Lynch by appellant, but by Ted Glisson, who like Freeman had a clear interest in seeing that the funds were transferred out of appel-

---

[13] Contractual survivorship provisions are enforceable under Georgia law. *Commercial Banking Co. v. Spurlock*, 238 Ga. 123, 125 (231 SE2d 748) (1977); see also OCGA § 44-6-190 (a). In addition, OCGA § 7-1-813 (a) provides that "[s]ums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent, unless there is clear and convincing evidence of a different intention at the time the account is created." This provision applies to all joint accounts held by a "financial institution," regardless of whether the account documents refer to a right of survivorship. OCGA § 7-1-810 (1), (3), (4). Although the record does not reflect whether Merrill Lynch qualifies as a "financial institution," the trial court concluded in a separate order that OCGA § 7-1-813 (a) applies and that the survivorship provisions of the Joint Account could therefore be overridden by clear and convincing evidence that Theodore Glisson did not intend for such provisions to apply. Although that particular ruling has not been challenged on appeal, even if OCGA § 7-1-813 (a) applies, we must view the evidence in the light most favorable to appellant. So viewed, the evidence does not show that Theodore Glisson had a contrary intent at the time the Joint Account was opened, since he in fact signed a document clearly providing for rights of survivorship.

lant's sole possession and into the estate account. No one at Merrill Lynch ever spoke with appellant to confirm that she had signed the document or to obtain her authorization to fill in the blanks so as to effectuate a transfer into the estate account. Miller simply filled out the form according to either (1) the alleged instructions of someone who was admittedly not his client, or (2) his own understanding of the decedent's intent. Clearly, a jury could conclude that this was not a reasonable effort to ensure that Merrill Lynch had its client's authorization to transfer a quarter of a million dollars out of her account.

Moreover, after discovering that the initial letter of authorization was insufficient to effect the transfer, Miller had two additional authorization letters prepared, although he claims not to have seen them after they were finalized. There is absolutely no evidence as to how appellant's purported signature came to appear on these documents, and abundant evidence that the signatures were forged. Miller denied giving these documents to Freeman or Ted Glisson, and they denied ever seeing them. Thus, the jury could conclude that they did not forge appellant's signature. As appellant correctly points out, there is no evidence that the documents ever actually left Merrill Lynch's possession. Although the trial court found that the documents "were mailed directly to [appellant] by Merrill Lynch . . . [and] were signed and returned to Merrill Lynch," there is no evidence whatsoever of such mailing, much less evidence that would *demand* such a finding, and appellant expressly denied ever receiving the documents in the mail. We also note that, in his conversation with Dickey, Miller never mentioned that appellant had signed the two subsequent authorization letters but simply said that appellant had come into his office on March 26 to sign the initial authorization letter. In addition to casting doubt on the signing of the two subsequent letters, this statement was patently false, as all parties agree that the initial authorization letter was delivered to Merrill Lynch by Ted Glisson and was not signed at Merrill Lynch's office.

With respect to the two subsequent authorization letters, therefore, the evidence is simply that (1) Davis prepared them at Miller's request, (2) they subsequently appeared on Davis' desk containing forged signatures of appellant, and (3) neither Merrill Lynch nor anyone else has any idea how the documents came to be signed. In light of Merrill Lynch's failure to provide *any* evidence as to how it obtained the signatures, and the positive evidence that the signatures were forged and that the documents were never sent to appellant or anyone else, we think the jury could reasonably infer that someone at Merrill Lynch forged appellant's signature. Although Merrill Lynch disclaims any motive to commit forgery, its motive could simply have been a desire to shortcut the transfer process,

which it believed had been authorized by the first letter of authorization. In this regard, we note that a Merrill Lynch administrative assistant, Denmark, admitted falsely notarizing a document at the request of Davis, when neither Davis nor Denmark saw the document being signed. Such false notarizing of documents was apparently not unusual at Merrill Lynch, according to Denmark.

With respect to the third basis for its decision, the trial court apparently accepted without question Miller's self-serving account of his brief encounter with appellant and Rawlins. According to Rawlins, however, the parties merely "exchanged pleasantries," and Miller did not even hint that he wanted to discuss other matters.[14] For summary judgment purposes, of course, the trial court should have construed the evidence in the light most favorable to appellant, not to Merrill Lynch. In any event, there is nothing in Miller's account to show that appellant was even made aware of the transfer, much less that she authorized it. Miller simply claims he told appellant that "we need to . . . review everything that's been done" and that appellant replied that "Carol is handling it." There is no indication that appellant was even aware Miller was referring to transfers from the Joint Account, as opposed to establishment of a trust account, for example. Clearly, a jury could conclude that this brief and ambiguous conversation did not constitute a reasonable effort by Miller to ensure that he had appellant's authority to transfer her personal assets to the estate account.

Finally, the fact that Merrill Lynch ultimately sought to interplead the funds maintained in the estate account does not insulate it from liability for its actions in wrongfully transferring the funds in the first place. In *Thompson v. Bank of the South*,[15] we discussed the concept of interpleader and the protection from liability afforded by that doctrine:

> The right to interpleader under OCGA § 9-11-22 depends upon the stakeholder's good-faith fear of adverse claims. The

---

[14] Merrill Lynch asserts that appellant's and Rawlins' affidavits were untimely filed and thus were not considered by the trial court. These affidavits were filed on August 7, 1998, 29 days after Merrill Lynch filed its summary judgment motion and more than nine months before the trial court ruled on the motion. Although the affidavits were filed within the time period set forth in OCGA § 9-11-56, Merrill Lynch notes that, in an order dated April 23, 1998, the trial court stated that "[t]he response time for [summary judgment motions] shall be shortened to twenty days." However, there is no indication that Merrill Lynch objected to consideration of the affidavits on the basis of timeliness or that the trial court refused to consider the affidavits. See *Pruitt v. Tyler*, 181 Ga. App. 174, 175 (1) (351 SE2d 539) (1986). Because Rawlins' affidavit contradicts Miller's account of the meeting, we need not consider whether appellant's affidavit contradicts her deposition testimony that she did not *recall* making the alleged statement.

[15] 172 Ga. App. 579 (323 SE2d 877) (1984).

adverse claims which authorize interpleader are those which might be brought against the stakeholder by the various claimants to the fund which he holds. Thus, where the adverse claims on a fund have in fact been interpleaded, it is proper to dismiss the holder of the disputed fund as a party to the action, assuming that no further relief against the holder is being sought or necessary. This is true because, if no direct *personal* liability is being sought and the *only* claims being asserted are *to the fund* that a party holds, his capacity in the action is that of merely a stakeholder. Under such circumstances, the mere stakeholder's successful invocation of the interpleader procedure serves to discharge him from the threat of potential liability to the adverse claimants of the disputed funds.[16]

In *Thompson*, a bank successfully interpleaded funds in certain accounts it held. In its original order granting the interpleader motion, the trial court stated that the bank was "released from any and all liability with respect to claims arising from or relating to its receipt, payment, delivery or other handling of the funds."[17] The court subsequently amended its order to remove this broad release language, however, stating that such language had the unintended effect of settling issues not raised in the case. We held that the court properly removed the broad release language, stating that

[t]he Bank was not . . . entitled to a general release from *any and all liability* regarding the . . . accounts. Assuming the existence of claims predicated upon the Bank's existing personal liability to [*whoever*] was the rightful claimant of the . . . accounts, such claims would not be based upon the Bank's capacity as the "mere stakeholder" of the disputed accounts, and the authorization of its interpleader action in the instant case would not resolve those claims. To give but one example, payment into court of an existing bank account fund pursuant to interpleader would not necessarily serve to extinguish any existing personal liability to the rightful claimant under OCGA § 11-3-419 for the holder's previous conversion of the funds in that account. The trial court correctly recognized that the language of its previous order afforded the Bank unwarranted protection from potential claims premised upon its personal liability with regard to the . . . accounts, rather than limiting that protection

---

[16] (Citations and punctuation omitted; emphasis in original and omitted.) Id. at 582 (2).
[17] (Punctuation omitted.) Id. at 580-581.

merely to its potential liability as against the "adverse claims" of [the two claimants to the accounts].[18]

The claims being asserted against Merrill Lynch in the present case are not based on its status as a mere stakeholder of the funds in question but are based on its allegedly improper actions in transferring such funds out of appellant's account without her permission. Accordingly, the mere fact that Merrill Lynch, after creating the controversy, disclaimed any personal interest in the funds and sought to interplead the funds in its possession does not relieve it from liability for its allegedly wrongful actions in transferring the funds without appellant's permission.[19]

In this case, a jury could conclude that Merrill Lynch breached its duty to appellant in numerous ways, including by (1) providing a blank letter of authorization to Freeman, (2) relying on Freeman's self-serving claim that appellant desired to have the funds transferred to the estate account, (3) filling in the blanks of the letter of authorization over appellant's purported signature based solely upon Freeman's representation as to appellant's intent or Miller's own belief as to the decedent's wishes, (4) failing to contact appellant to confirm that she authorized the transfer of funds into the estate account, and (5) forging or allowing to be forged appellant's signature on the two subsequent letters of authorization. Although Merrill Lynch claims that appellant has not been harmed because the funds are still on deposit, we cannot say that a person suffers no harm when her funds are improperly transferred to a third party, she is denied access to the funds for an extended period of time, and she may be forced to resort to protracted litigation to recover the funds. Accordingly, the trial court erred in granting summary judgment to Merrill Lynch on appellant's claims for negligence and breach of fiduciary duty.

2. Appellant also appeals the grant of summary judgment to Merrill Lynch on her claim for conversion. As the Supreme Court has recognized,

[c]onversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of

---

[18] (Emphasis in original.) Id. at 582-583 (2).

[19] Although not raised by either party, we note that the trial court's order granting the interpleader motion did not contain the broad release language in the original *Thompson* order and did not purport to release Merrill Lynch from liability for its own wrongful actions in transferring the funds. The order simply purported to discharge Merrill Lynch from any liability relating to the cash management account created in the court's January 26, 1998 order.

dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation. Any distinct act of dominion wrongfully asserted over another's property in denial of his right, or inconsistent with it, is a conversion.[20]

Although Merrill Lynch argues that a defendant cannot be held liable for conversion unless it converts the property to its own use, the Supreme Court has squarely rejected this proposition:

It is unnecessary to show that the defendant applied it to his own use, if he exercised dominion over it in defiance of the owner's right, or in a manner inconsistent with it. It is in law a conversion whether it be for his own or any other's use. . . . [I]n order to be chargeable with conversion, technically it is not necessary that the defendant assert any right of ownership over the property; it is sufficient if the defendant wrongfully assumes dominion over the property inconsistent with the owner's right.[21]

Moreover, the Supreme Court has held that "[i]t is immaterial that such dominion was exercised in good faith, for [w]hoever meddles with another's property, whether as principal or agent, does so at his peril, and it makes no difference that in doing so he acts in good faith."[22]

With respect to brokers, it has been stated that,

[a]s a general rule, if a broker wrongfully misappropriates . . . or otherwise exercises unauthorized acts of dominion or ownership over funds, stocks, or other property belonging to a customer, in denial of, or inconsistently with, the customer's rights therein, it constitutes a conversion for which he is liable in damages to the customer.[23]

Regardless of whether Merrill Lynch thought that appellant had actually signed the initial blank letter of authorization, it is undisputed that Merrill Lynch never contacted appellant to ask how she wanted the blanks to be filled in. Instead, Merrill Lynch simply filled

---

[20] (Citations and punctuation omitted.) *Maryland Cas. Ins. Co. v. Welchel*, 257 Ga. 259, 261 (356 SE2d 877) (1987).

[21] (Citations and punctuation omitted.) Id.

[22] (Punctuation omitted.) Id.

[23] 12 CJS, Brokers, § 66, p. 198. See also id. at § 78, p. 231 ("[t]he principal may sue for conversion, where the broker . . . disposes of or misappropriates funds or securities belonging to the principal").

in the blanks itself. Although Miller claims that Freeman told him appellant wanted to transfer the funds into the estate account, Miller's testimony is contradicted by Freeman and Ted Glisson, who denied that Miller told them the authorization letter would be used for that purpose. There is evidence that Miller believed Theodore Glisson wanted the funds in the Joint Account to pass to the testamentary trust upon his death. A reasonable inference is that Miller simply filled in the blanks in accordance with his understanding as to the *decedent's* intent, without having sought appellant's authorization for the transfer. Of course, if the funds in the Joint Account passed to appellant pursuant to the right of survivorship, then the decedent's intent would not be relevant.[24]

After the initial authorization letter was deemed to be deficient, Miller had two additional letters prepared, although again he did not seek appellant's authorization. There is no evidence that these two letters were ever sent to appellant or even left Merrill Lynch's possession, and there is abundant evidence that appellant's signatures on these documents were forged. Pursuant to these two documents, Merrill Lynch transferred the funds from the Joint Account into an account in appellant's name, and then transferred the funds from appellant's account into the estate account, all without obtaining or even seeking to obtain appellant's authorization.

Under all of these circumstances, we believe the evidence would authorize a jury to conclude that Merrill Lynch wrongfully exercised dominion over appellant's property in a manner inconsistent with her ownership rights. It is immaterial that Merrill Lynch did not convert the property to its own use or that it might have believed the end result was proper. Although, several months after the transfer, Merrill Lynch sought to interplead the funds in the estate account, any conversion occurred when Merrill Lynch wrongfully transferred the funds to the estate account and refused to reverse the transfer, thus depriving appellant of her property. Accordingly, the trial court erred in granting summary judgment to Merrill Lynch on this claim.

3. Appellant contends that the trial court erred in awarding summary judgment to Merrill Lynch on her claim for attorney fees and litigation expenses. Under OCGA § 13-6-11, such fees and expenses may be awarded "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff

---

[24] In granting summary judgment to Merrill Lynch, the trial court stated that "the first element of the tort of conversion, ownership of the property by the plaintiff, is absent." The only way appellant would not have had ownership of the Joint Account prior to the transfer is if the survivorship provisions of the account were unenforceable and the funds passed into the decedent's estate as a matter of law. As discussed above, however, for summary judgment purposes it must be assumed that the survivorship provisions are enforceable.

unnecessary trouble and expense." The "bad faith" contemplated by the statute refers to bad faith in the transaction giving rise to the lawsuit.[25] We believe there was ample evidence from which a jury could find bad faith on the part of Merrill Lynch. For example, if the jury concluded that Merrill Lynch was responsible for the forgery of appellant's signature on the two letters of authorization, this would constitute an obvious example of bad faith.[26] The jury could also conclude that Merrill Lynch exercised bad faith in filling out the initial letter of authorization without having received any instructions from appellant to do so. Accordingly, the trial court erred in granting summary judgment to Merrill Lynch on this claim.

4. In two enumerations, appellant contends that the trial court erred in granting summary judgment to Merrill Lynch on her claims for emotional and punitive damages. In neither of these enumerations, however, does she provide any legal argument or citation to relevant case law, nor does she provide any analysis of or citation to the evidence. Instead, she simply asserts conclusorily that, if Merrill Lynch is responsible for the forgeries, then it could be held liable for emotional and punitive damages. These conclusory assertions, in the absence of any analysis or legal argument, do not constitute the type of argument necessary to preserve an enumeration for appellate review.[27]

### Case No. A99A2319

In her complaint, appellant asserted claims against Freeman for fraud, theft by deception, breach of fiduciary duty, and negligent misrepresentation. Freeman moved for summary judgment on two grounds. First, she argued that no action on her part was the proximate cause of any damage to appellant, since the transfer of funds was not effected pursuant to the initial letter of authorization Freeman gave to Merrill Lynch but pursuant to the two subsequent letters of authorization prepared by Merrill Lynch. Second, with respect to the fraud claim only, Freeman argued that there was no evidence

---

[25] *Brown v. Baker*, 197 Ga. App. 466, 467 (3) (398 SE2d 797) (1990).

[26] See *Crawford v. Crump*, 223 Ga. App. 119, 122 (1) (b) (476 SE2d 855) (1996) (upholding award of attorney fees where defendants used "sham documents" in transaction).

[27] See *Clark v. Stafford*, 239 Ga. App. 69, 74 (4) (522 SE2d 6) (1999) (mere conclusory statements are "not the kind of argument required to preserve an enumeration for appellate review"); *Green v. State*, 208 Ga. App. 1, 2 (2) (429 SE2d 694) (1993) (" 'principal purpose of argument is to provide guidance to this court on the basis for a claim of error and for citations of authority which tend to support appellant's allegation of error' "); *Jenkins v. State*, 240 Ga. App. 102 (1) (522 SE2d 678) (1999) ("[m]ere conclusory statements . . . are not the type of meaningful argument contemplated by" Court of Appeals Rule 27 (c) (2)); *Pickens v. State*, 225 Ga. App. 792, 800 (7) (484 SE2d 731) (1997); *Martin v. State*, 179 Ga. App. 551, 555 (8) (347 SE2d 247) (1986).

she made any misrepresentation to appellant. In Freeman's view, because appellant denied signing the original letter of authorization, Freeman could not have made any misrepresentation to obtain her signature. The trial court granted summary judgment to Freeman based on both theories.

5. Appellant argues that the trial court erred in holding that Freeman's actions could not have been the proximate cause of any damage to appellant. We agree.

As we have previously held, "[w]hen an injury can be traced directly to a wrongful act, and but for such wrongful act it could not reasonably be supposed that the injury would have resulted, this essentially antecedent act may be said to be the proximate cause of the injury."[28] Proximate cause "does not necessarily mean that which is nearest, but refers rather to the efficient cause."[29] Moreover,

> there may be more than one proximate cause of an injury; the proximate cause of an injury may be two separate and distinct acts of negligence acting concurrently; and where two concurrent acts of negligence operate in bringing about an injury, the person injured may recover from either or both of the persons responsible. The mere fact that the plaintiff's injuries would not have been sustained had only one of the acts of negligence occurred will not of itself operate to limit the other act as constituting the proximate cause.[30]

In this case, if the jury believes that Freeman either forged or wrongfully procured appellant's signature on the initial letter of authorization and that she affirmatively misled Merrill Lynch into believing that appellant consented to the transfer, she would not be relieved from liability simply because the initial authorization letter was not itself sufficient to effect the transfer. If the jury believes that Merrill Lynch forged the two subsequent authorization letters, it could conclude that it did so in reliance on Freeman's misrepresentation as to appellant's intent. Alternatively, the jury could conclude that Freeman's misrepresentation caused Merrill Lynch to be less than diligent in ensuring that appellant's signature on the two subsequent authorization letters was genuine. Regardless of the nature of Merrill Lynch's alleged misfeasance, the jury could conclude that

---

[28] (Punctuation omitted.) *Parris v. Pledger Ins. Agency*, 180 Ga. App. 437, 439 (2) (348 SE2d 924) (1986).

[29] (Punctuation omitted.) *Atlanta Gas Light Co. v. Mills*, 78 Ga. App. 690, 695 (1) (51 SE2d 705) (1949).

[30] Id.

Freeman's actions directly contributed to the improper transfer. Accordingly, the trial court erred in holding that Freeman's actions could not have been the proximate cause of any damage to appellant.

6. Appellant also contends that the trial court erred in finding that there was no evidence of a misrepresentation by Freeman. We agree.

The trial court held that, because appellant denied signing the initial letter of authorization, she could not have signed it based on any misrepresentation by Freeman. This reasoning is flawed, however, as the fact that appellant did not recall signing the letter of authorization is not inconsistent with a finding that she signed the document unknowingly. Freeman and Ted Glisson both testified that appellant signed the document in their presence, so there is certainly evidence that appellant in fact signed the document. The question is whether there is evidence that she signed it unknowingly pursuant to any misrepresentation by Freeman. Ted Glisson testified that there was only one occasion on which he went to appellant's house to have her sign documents. Appellant also testified that there was only one occasion where Freeman and Ted Glisson brought documents for her signature. Clearly, therefore, the jury could find that, if appellant signed the authorization letter, it was at that one meeting. Appellant and Rawlins both testified that Freeman never showed appellant the letter of authorization.[31] Appellant stated that Freeman showed her a stack of documents and explained that they were tax documents appellant needed to sign. Viewed in the light most favorable to appellant, the jury could infer that, if appellant in fact signed the authorization letter, she did so unknowingly based on Freeman's representation that the stack of documents were simply tax documents.[32] Accordingly, the trial court erred in holding that there was no evidence of misrepresentation by Freeman.

*Judgment affirmed in part and reversed in part in Case No. A99A2480. Judgment reversed in Case No. A99A2319. Andrews, P. J., and Ellington, J., concur.*

DECIDED MARCH 24, 2000.

*Jerrell T. Hendrix, Carl M. Nelson, Jr.*, for appellant.
*Brennan, Harris & Rominger, Richard A. Rominger, Lisa R.*

---

[31] Even Freeman admits that she told appellant the blank authorization letter would simply be used to open up the estate account, not that it would be used to transfer funds out of the Joint Account.

[32] In her summary judgment motion, Freeman did not raise the issue of whether such reliance would be reasonable, except to assert that there can be no reliance on a nonexistent representation.

*Richardson*, for appellee (case no. A99A2319).

*Long, Aldridge & Norman, Terry R. Weiss, M. Graham Loomis*, for appellee (case no. A99A2480).