A07A2346, A07A2347. DUDLEY et al. v. WACHOVIA BANK, N.A. et al. (two cases).
(659 SE2d 658)

ELLINGTON, Judge.

As the executors of the estate of Harold A. Dudley, Sr. ("Mr. Dudley"), Harold A. Dudley, Jr., and Patricia Ann Dudley Jenkins (collectively, "the executors") brought this action seeking damages and equitable relief against Sarah S. Dudley ("Mrs. Dudley"), American Family Life Assurance Company, Inc. ("AFLAC"), Regions Bank, Inc., Regions Financial Corporation, The Southern Company, and Wachovia Bank, N.A. In two orders, the Superior Court of Gwinnett County granted the motions for summary judgment filed by the corporate defendants.[1] The executors appeal, contending that jury issues exist regarding whether the corporate defendants are liable for their roles in the wrongful registration of the transfer of certain stock Mr. Dudley owned which caused the stock not to become part of his estate when he died. For the reasons that follow, we affirm in part and reverse in part.

In order to prevail on a motion for summary judgment under OCGA § 9-11-56,

> the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

---

[1] The case remains pending against Mrs. Dudley.

(Citations and punctuation omitted.) *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

Viewed in the light most favorable to the executors, the record shows the following undisputed facts. Mr. Dudley executed his last will in 1998. Among other specific bequests, he left his wife their home, his vehicles, and $50,000. He left the remainder of his estate to the executors, his two adult children from his first marriage. In 2003, Mr. Dudley's assets included shares of stock in AFLAC, Regions Financial and Southern. On June 3, 2003, Mr. Dudley, who by that time was suffering from dementia, had a stroke.

On August 18, 2003, Mrs. Dudley transported Mr. Dudley to the offices of AFLAC and presented a form which assigned Mr. Dudley's book-entry AFLAC stock "TOD" (transfer on death) to Mrs. Dudley. On behalf of AFLAC, Patricia Bell signed the stock assignment form as a "Medallion guarantee"[2] of Mr. Dudley's signature.

On the same day, Mrs. Dudley transported Mr. Dudley to the offices of Wachovia Bank and presented a stock transfer request form directing that his book-entry Southern stock be transferred to a joint account with Mrs. Dudley. Mr. Dudley made his mark, and Brenda Taylor, who was the branch's manager and an assistant vice president of Wachovia, signed the stock transfer request form as a Medallion guarantee of Mr. Dudley's signature.

Finally, on November 18, 2003, Mrs. Dudley transported Mr. Dudley to the offices of Regions Bank and presented a transfer of ownership form directing that Mr. Dudley's book-entry Regions Financial stock be transferred to a joint account with Mrs. Dudley.

---

[2] In 1992, the Securities and Exchange Commission adopted Rule 17Ad-15 (17 CFR 240.17Ad-15) to "[p]rovide for the protection of investors; facilitate the equitable treatment of financial institutions which guarantee signatures of endorsers of securities; increase the efficiency of the security transfer process; and, reduce the risk associated with a signature guarantor's inability to meet its obligations." 57 Fed. Reg. 1082 (January 10, 1992). The rule requires transfer agents to treat guarantor institutions fairly, that is, by not unreasonably refusing to honor a transfer request, but allows transfer agents to reject a request for transfer because the guarantor does not meet the transfer agent's written standards. 57 Fed. Reg. 1082; 17 CFR 240.17Ad-15 (b), (c), (d). See 7 Hawkland UCC Series § 8-406:01 (revised February 2007) (transfer agents perform numerous functions connected with maintaining an issuer's stock record books, including recording the transfer of shares, effectuating restrictive legends on stock certificates, and certifying shareholder lists for purposes of voting at shareholders' meetings). Specifically, transfer agents are authorized to reject a transfer request if the signature is not guaranteed by an eligible guarantor that participates in one of the approved signature guarantee programs. Id.; 17 CFR 240.17Ad-15 (g). The securities industry has implemented SEC Rule 17Ad-15 with the creation of three signature guarantee programs, including the Securities Transfer Agents Medallion Program (STAMP), in which the signature guarantors in this case participated. Egon Guttman, 28 Modern Securities Transfers § 13.5, n. 6 (3d ed.).

Anne Pate, an assistant vice president of Regions Bank, signed the stock transfer form as a Medallion guarantee of Mr. Dudley's signature.

Mr. Dudley died on March 26, 2004. As a result of the August 18 and November 18, 2003 transfers, Mr. Dudley's stock, allegedly worth approximately $650,000, did not upon his death become part of his estate subject to distribution under his will. Instead, Mrs. Dudley became the sole owner of the stock.

Alleging that Mr. Dudley was not legally competent at the time of the stock transfers, the executors filed this action and asserted claims for conversion, negligence, and avoidance of the stock transfers. The trial court granted the motions for summary judgment filed by the corporate defendants.

1. The executors contend the trial court erred in ruling that Mr. Dudley's estate has no cause of action against the signature guarantors. Under Georgia's Commercial Code, a person who guarantees the signature of an indorser of a security certificate or, in the case of uncertificated securities, the signature of the originator of an instruction, warrants, inter alia, that at the time of signing the signer had the legal capacity to sign.[3] The Code section provides that the warranties are made only "to a person taking or dealing with the security in reliance on the guaranty." OCGA § 11-8-306 (h). Under OCGA § 11-8-306 (h), a signature guarantor "is liable to [a person taking or dealing with the security in reliance on the guaranty] for loss resulting from [the] breach" of the warranties set out in the Code section. As the executors point out, when Mr. Dudley died, his causes of action, whether based on statute, contract or tort, did not abate but, rather, survived to his legal representatives.[4] The executors contend

---

[3] (a) A person who guarantees a signature of an indorser of a security certificate warrants that at the time of signing:
  (1) The signature was genuine;
  (2) The signer was an appropriate person to indorse, or if the signature is by an agent, the agent had actual authority to act on behalf of the appropriate person; and
  (3) The signer had legal capacity to sign.
(b) A person who guarantees a signature of the originator of an instruction warrants that at the time of signing:
  (1) The signature was genuine;
  (2) The signer was an appropriate person to originate the instruction, or if the signature is by an agent, the agent had actual authority to act on behalf of the appropriate person, if the person specified in the instruction as the registered owner was, in fact, the registered owner, as to which fact the signature guarantor does not make a warranty; and
  (3) The signer had legal capacity to sign.
OCGA § 11-8-306 (UCC § 8-306, formerly UCC § 8-312).
[4] See Richard C. Ruskell, Davis and Shulman's Ga. Practice and Procedure § 1:9, pp. 21-22 (2007 ed.).

that the signature guarantors are liable to the estate under OCGA § 11-8-306 because Mr. Dudley, as the owner of the stock, dealt with the security within the terms of OCGA § 11-8-306 (h). While this appears to be a matter of first impression in Georgia, other jurisdictions considering the issue have consistently held that the warranties made by a signature guarantor do not flow to the owner of stock.

In *Love v. Pennsylvania R. Co.*, 200 FSupp. 561 (E.D. Pa. 1961), for example, a daughter who owned stock jointly with her father brought suit after someone allegedly forged her name on an assignment transferring her interest to her father. The trial court concluded that the daughter, as the owner of the subject securities, could not be deemed a person taking or dealing with the securities in reliance on her own guaranteed signature, as those terms are used in UCC § 8-306 (formerly UCC § 8-312). Id. at 562-563. As a result, the daughter had no cause of action based on the guarantor's warranties directly against the bank that had guaranteed her forged signature. Id.[5] We are persuaded by these authorities that a signature guarantor is not liable to the owner of stock for loss from any wrongful registration of a transfer of the stock.

The executors contend that, even if they have no cause of action against the signature guarantors under OCGA § 11-8-306, they may pursue a common law negligence claim against them, citing OCGA § 11-1-103.[6] We disagree. Under Georgia law, where the Commercial Code specifies warranties that are implied by certain conduct, the parties protected by the warranties are generally limited to the remedies provided in the Code. "To allow recovery [under a common law theory such as] unjust enrichment would make the specified warranties meaningless and impair the negotiability of securities." *Brannon v. First Nat. Bank of Atlanta*, 137 Ga. App. 275, 278 (3) (223 SE2d 473) (1976) (construing the predecessor to current Code section 11-8-108, regarding warranties made by a person transferring a security to a purchaser for value).

Based on the foregoing, we conclude that an owner of stock has no cause of action either under the Commercial Code or the common

---

[5] See also *Southern Ohio Bank v. Merrill Lynch &c.*, 479 F2d 478, 480 (6th Cir. 1973) (citing *Love v. Pennsylvania R. Co.* for the premise that the class of persons taking or dealing with a security in reliance on a signature guarantee does not include the true owner of the stock); *Lichtenstein v. Kidder, Peabody &c.*, 840 FSupp. 374, 388 (II) (C) (W.D. Pa. 1993) (accord); *Lowes v. Merrill Lynch &c.*, 344 NYS2d 55, 57 (1973) (accord).

[6] OCGA § 11-1-103 (UCC § 1-103) provides:
Unless displaced by the particular provisions of [the Commercial Code], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

law against an entity that participates as a signature guarantor in the wrongful registration of a transfer of stock. It follows that no such cause of action flowed to Mr. Dudley's legal representatives upon his death. Accordingly, the trial court correctly granted summary judgment in favor of those entities that acted solely as signature guarantors, that is, Wachovia and Regions Bank.[7]

2. The remaining corporate defendants, AFLAC, Regions Financial, and Southern, had a different role in these transactions from that of mere signature guarantors, as discussed in Division 1, supra. Rather, these corporations issued the stock that was the subject of the indorsements and transfer instructions. Under OCGA § 11-8-404 (a) (UCC § 8-404 (a)), "an issuer is liable for wrongful registration of transfer if the issuer . . . register[s] a transfer of a security to a person not entitled to it, and the transfer [is] registered . . . [p]ursuant to an ineffective indorsement or instruction."[8] Indeed, issuers and transfer agents ordinarily require signature guarantees on indorsements and transfer instructions precisely because of this "absolute liability." Egon Guttman, 28 Modern Securities Transfers § 14:1 (3d ed.).[9] A signature guarantee does not absolve the issuer from liability for wrongful registration of a transfer, however; it merely shifts the financial risk to the guarantor.[10] Id.

While the executors did not explicitly invoke OCGA § 11-8-404 in their complaint, "[t]he well established rule in Georgia is that, under our system of notice pleading, the substance, rather than the nomenclature, of legal pleadings determines their nature." (Citations omitted.) *Cotton v. Fed. Land Bank*, 246 Ga. 188, 191 (269 SE2d 422)

---

[7] We note that AFLAC acted both as a signature guarantor and as an issuer. See Division 2, infra.

[8] See OCGA §§ 11-8-406 (UCC § 8-406, formerly UCC § 8-405 (1)) (providing an exception in certain cases of lost, apparently destroyed, or wrongfully taken security certificates); 11-8-407 (providing that a transfer agent "has the same obligation to the holder or owner of a certificated or uncertificated security with regard to the particular functions performed as the issuer has in regard to those functions").

[9] See Official Comment 1 to UCC § 8-402 ("An issuer is absolutely liable for wrongful registration of transfer if the indorsement or instruction is ineffective. See Section 8-404. Accordingly, an issuer is entitled to require such assurance as is reasonable under the circumstances that all necessary indorsements are effective, and thus to minimize its risk."); Official Comment to UCC § 8-404 ("The fact that the issuer had no reason to suspect that the indorsement was forged [or otherwise ineffective] or that the issuer obtained the ordinary assurances under Section 8-402 does not relieve the issuer from liability" for wrongful registration of a transfer under Section 8-404 (a).); Official Comment to UCC § 8-407 (formerly UCC § 8-406) ("Transfer agents . . . are [in UCC § 8-407] expressly held liable both to the issuer and to the owner . . . for wrongful registration of a transfer in any case within the scope of their . . . functions where the issuer would itself be liable.").

[10] We note that the signature guarantee issued by AFLAC on a transfer request regarding its own stock failed to shift the financial risk to a third party. Furthermore, the record does not show that issuers Regions Financial and Southern have asserted claims in this action based on the signature guarantees executed by Regions Bank and Wachovia, respectively.

(1980). Accordingly, complaints and other pleadings should be construed as to do substantial justice, that is, liberally in favor of the pleader. Id.; *Ballard v. Rappaport*, 168 Ga. App. 671 (310 SE2d 4) (1983); see OCGA § 9-11-8 (f) ("All pleadings shall be so construed as to do substantial justice."). We conclude that the executors' complaint can be construed as asserting a claim under OCGA § 11-8-404 against AFLAC, Regions Financial, and Southern as issuers of Mr. Dudley's stock.[11] Based on the foregoing, the trial court erred in granting summary judgment in favor of AFLAC, Regions Financial, and Southern on the executors' claim for wrongful registration of the transfer of Mr. Dudley's stock.

3. An additional basis the trial court gave for its award of summary judgment in favor of the corporate defendants was a lack of evidence Mr. Dudley was harmed by the "change in ownership status" of the subject stock. The court observed that Mr. Dudley "was never personally deprived of the stock in reliance upon the signatures at issue and indeed owned the stock until he died." The executors challenge this conclusion as well.

Evidence in the record shows that Mr. Dudley, while competent, executed a will that, absent the transfers to Mrs. Dudley, would have resulted in the subject stock becoming part of his estate. In addition, it is undisputed that, under the will, Mrs. Dudley would not have received the stock, either through a specific bequest or by virtue of being entitled to the remainder of the estate. The executors, who will bear the burden of proving incompetency at trial,[12] identified lay and

---

[11] We note that the executors' claim for relief is consistent with that authorized by OCGA § 11-8-404, that is, replacement of the stock or its value. See OCGA §§ 11-8-404 (b) ("An issuer that is liable for wrongful registration of transfer under subsection (a) of this Code section on demand shall provide the person entitled to the security with a like certificated or uncertificated security, and any payments or distributions that the person did not receive as a result of the wrongful registration. If an overissue would result, the issuer's liability to provide the person with a like security is governed by Code Section 11-8-210."); 11-8-210 (a) (" '[o]verissue' means the issue of securities in excess of the amount the issuer has corporate power to issue"); 11-8-210 (d) ("If a security is not reasonably available for purchase, a person entitled to issue or validation may recover from the issuer the price the person or the last purchaser for value paid for it with interest from the date of the person's demand."). For a discussion of common law claims available before the adoption of the UCC against the issuer of stock for wrongful registration of transfers, see 11 Fletcher, Cyclopedia of the Law of Corporations (revised September 2007), §§ 5113, 5115, 5543, 5551; *Frye v. Commonwealth Investment Co.*, 107 Ga. App. 739, 741-742 (2) (131 SE2d 569) (1963) (under the Uniform Stock Transfer Act, which was superceded by the UCC, the officers of a corporation had a fiduciary duty to the company's stockholders to protect the stockholders from fraudulent or unauthorized transfers of their shares).

[12] See *Wheeless v. Gelzer*, 780 FSupp. 1373, 1382 (II) (58), (59) (N.D. Ga. 1991) ("Georgia law presumes every man to be sane and competent, and as regards either the making of a contract or the giving of a gift, the burden is on the party attacking competency to prove the incompetency asserted. Moreover, proof of a temporary loss of competency creates no presumption that it continued up to the time of execution of the transaction being challenged, and the

expert opinion testimony in the record showing that, after his stroke in June 2003, Mr. Dudley could not reason, make business decisions, speak, walk, or care for any of his own needs. As the trial court found, therefore, there is a material question of fact regarding whether Mr. Dudley was legally competent at the time of the transfers. Finally, it is undisputed that, as a result of the transfers, the stock instead became the sole property of Mrs. Dudley. Thus, there is some evidence in the record supporting an inference that the issuers' conduct deprived Mr. Dudley of the precious right of deciding who should have his property after he died.[13] It follows that, even though Mr. Dudley may have continued to enjoy the benefits of ownership while he lived, the trial court erred in finding as a matter of law that he was not harmed by the "change in ownership status" of the subject stock.

4. The executors contend that the trial court erred in granting the corporate defendants' motion for summary judgment on Count 3 of the amended complaint, the executors' claim pursuant to OCGA § 13-3-24 to avoid the stock transfers made when Mr. Dudley was allegedly mentally incompetent and lacked the capacity to contract. By definition, an action in equity to avoid and set aside a transfer of property lies against those who gave or took an interest in the property.[14] Because there is no evidence that the corporate defendants own or control the stock at issue, the trial court did not err in granting their motion for summary judgment on Count 3.

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Adams, J., concur.*

---

burden remains on the party alleging incapacity to show such incapacity at the particular time of the transactions being challenged.") (citations and punctuation omitted).

[13] See *Hill v. Deal*, 185 Ga. 42, 52 (193 SE 858) (1937) ("The right to say who shall, after the death of the owner, have his property, is a right long held precious in the history of English law.") (citation and punctuation omitted); *Glisson v. Freeman*, 243 Ga. App. 92, 104 (1) (532 SE2d 442) (2000) (jury question existed regarding whether stock owner was harmed when stock broker improperly transferred funds to a third party, although funds were still on deposit, because the owner was denied access to the funds for an extended period of time and was forced to resort to protracted litigation to recover the funds).

[14] See *Harper v. Atlanta Milling Co.*, 203 Ga. 608 (48 SE2d 89) (1948) (where an insolvent debtor used his assets to purchase property, taking title in the name of another in order to defraud his creditors, the proper defendants to the action were the debtor and the third party who took title to the property); *Neal v. Stapleton*, 203 Ga. 236 (46 SE2d 130) (1948) (the proper defendants to a suit to set aside a deed were the grantor, who became insolvent as a result of the transfer, and the grantees who took title to the property); *Jones v. Union Central Life Ins. Co.*, 178 Ga. 591 (1) (173 SE 845) (1934) (under predecessor Code section to OCGA § 13-3-24, "[t]he deed of an insane person, though made without fraud and for an adequate consideration, may be avoided by his heirs, not only as against his immediate grantee but also as against bona fide purchasers for value and without notice of such insanity") (citations and punctuation omitted).

DECIDED MARCH 10, 2008.

*Spix & Krupp, Mark V. Spix, Barry L. Katz,* for appellants.

*Carlock, Copeland, Semler & Stair, Thomas S. Carlock, Troutman Sanders, Michael E. Johnson, Seam Park, Parker, Hudson, Rainer & Dobbs, William J. Holley II, Grogan, Rumer & Gunby, William C. Rumer,* for appellees.