## A11A0390. COTTON v. SMITH et al.

(714 SE2d 55)

ELLINGTON, Chief Judge.

On the morning of September 3, 2008, a LaGrange High School front office employee allowed a 14-year-old student, N. F., to leave school with a middle-aged man who claimed to be the girl's uncle. Shortly thereafter, the man, a 52-year-old convicted felon who had given the employee a fake name and who was not related to N. F., took her to a house and molested her. N. F.'s mother, LaTasha Cotton, as parent and next friend of the girl, filed a negligence suit against the employee, Deann Smith, and her supervisor, school principal Steven Cole, in their individual capacities. Cotton now appeals from

an order of the Superior Court of Troup County granting summary judgment in favor of both defendants. Cotton contends that the trial court erred in finding as a matter of law that Smith's duties in determining whether to release a student from school were discretionary in nature, not ministerial, and that, as a result, Smith was entitled to official immunity from liability for her claims. Cotton also argues that the court erred in finding, alternatively, that, even if Smith violated a ministerial duty, such violation was not the proximate cause of N. F.'s injuries, because they were the result of an unforeseeable criminal act by a third party. As explained below, we reverse the trial court's grant of summary judgment to Smith, while the court's grant of summary judgment to Cole is affirmed by operation of law.

1. As an initial matter, Cotton has failed to assert on appeal any error in the trial court's grant of summary judgment to Cole. Thus, any error in that portion of the court's order is deemed abandoned, and the court's grant of summary judgment to Cole is affirmed by operation of law. See Court of Appeals Rule 25 (c) (2); *Lang v. Becham*, 243 Ga. App. 132 (530 SE2d 746) (2000) (because the appellant presented no specific argument, cited no authority, and made no reference to the transcript or record to support a claim of error regarding the grant of summary judgment to one of the appellees, any error as to that appellee was deemed abandoned).

2. Cotton contends that the trial court erred in finding as a matter of law that Smith's duties in determining whether to release a student from school were discretionary in nature, not ministerial, and that, as a result, Smith was entitled to official immunity from liability for her claims.

> In order to prevail on a motion for summary judgment under OCGA § 9-11-56, the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment[,] the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citations omitted.) *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006). Viewed in this light, the record shows the following,

undisputed facts.[1]

On September 3, 2008, N. F. was a 14-year-old freshman student at LaGrange High School, which had an enrollment of approximately 1,400 students. The school maintained a computerized "master file" on each student which contained, among other things, a list of people who were authorized to check the student out of school during regular school hours. Further, all incoming students that year received a copy of LaGrange High School's "Student Planner 2008-2009," which contained the following relevant provision in the section entitled "Check Out Early":

> Students checking out of class early must check out on their "early out record" card in the front office. **A parent note, doctor appointment note, court appearance summons, or other certified documentation must be presented to the attendance clerk** *at the time of check out each time a student checks out. The note must have a phone number whereby the parent can be reached by an administrator for verification.* . . . Students without a note will not be granted permission to leave. **Students will not be granted permission to leave based on telephone requests**. Students without notes must be signed out by a parent or guardian.

(Emphasis in original.) Defendant Smith, the front office employee, admitted during her deposition that she was familiar with the student planner and the quoted provision and that the planner contained "rules" that tell school employees and students what they are supposed to do and what the school expects from them. In fact, Smith admitted that she considered the above provision to be a "requirement" that had to be met before a student would be allowed to leave school early, adding that she checked students in and out of school "at least 150 times a day." During his deposition, the school principal, Cole, agreed that compliance with the provision was mandatory, and he testified that the purpose of the rules in the student planner was, at least in part, to protect the students.

Although the 2008-2009 school year started in early August 2008, N. F. did not start her freshman year until mid-August, about two weeks before the incident at issue in this case. N. F. had not checked out of school through the front desk prior to September 3, however, and Smith admitted that, on that date, she did not know N. F. or the girl's parents. N. F.'s computerized master file showed

---

[1] There is no transcript of the summary judgment hearing in the appellate record.

that the only people who were authorized to check her out were her mother, Cotton, and her father, "Vincent Cameron." Even so, at approximately 9:37 a.m. on September 3, a middle-aged man approached Smith at the school's front desk and told her that he was there to check N. F. out of school for an appointment.[2] Smith did not recognize the man, who was later identified as 52-year-old convicted felon Joseph Hardy, so she asked him for his name, and Hardy responded that he was the girl's uncle, "Frank F___." Smith did not ask to see Hardy's driver's license or other identification,[3] but had him sign a "check-out card" for N. F. while she called N. F.'s class and asked her to come to the front desk. Shortly thereafter, N. F. arrived at the front desk and then left school with Hardy. According to N. F., Hardy told her that her mother had asked him to pick her up from school and that her mother was going to meet them.[4] Hardy then drove N. F. to his daughter's house, where he molested her.[5]

Cotton filed suit against Smith and Smith's supervisor, school principal Cole, contending that Smith was negligent in releasing N. F. to Hardy and that Cole negligently supervised Smith. In response to the defendants' assertion that they were protected by official immunity, Cotton contended that, when Smith failed to ask Hardy for identification to confirm his name and failed to check N. F.'s master file to see if "Frank F___" was authorized to check N. F. out from school, Smith breached her ministerial duty to take specific actions that were mandated by the school and the county school board.

In support of these contentions, Cotton showed, in addition to the above evidence, that the Troup County School System had an "Emergency Preparedness Plan" for LaGrange High School and that the plan included two relevant sections. The section entitled "F. School Visitors," stated as follows:

> The Troup County staff considers the parents of its student[ ]s one of its greatest assets. While all parents are

---

[2] Smith admitted during her deposition that she had no independent memory of dealing with the man or with N. F. that day or of anything that was said while the man was at the front desk, adding that "there was nothing remarkable that happened at that moment."

[3] During his deposition, Hardy explained that, when he checked N. F. out of school, he used the same last name as N. F. in the hope that the school would be more likely to release N. F. to a relative, and he admitted that he did not have an identification card in his possession to give to school officials if they had asked to see it in order to confirm his identity.

[4] There is some evidence that, at the time of the September 3 incident, Hardy was having an affair with N. F.'s mother, Cotton, and that N. F. had met Hardy about two weeks earlier, while she was running errands with her mother.

[5] As a result of the incident, Hardy was charged with, and pled guilty to, forgery in the first degree, OCGA § 16-9-1; enticing a child for indecent purposes, OCGA § 16-6-5; and child molestation, OCGA § 16-6-4 (a).

encouraged to be active participants in the education of their children, several measures are taken to ensure that the open-door policy does not jeopardize the safety of the students or staff. . . . Signs are posted on all doors welcoming visitors by directing them to the office. Once in the office, visitors must state the nature of their business and *will be asked for identification if the office staff does not know them.*

(Emphasis supplied.) Further, the section entitled "G. Student Sign-In and Out," included the following provision:

Students who arrive after the tardy bell must be signed-in. Parents or other authorized persons who wish to pick up students before regular dismissal time must report to the office to sign the student out. *Office staff will routinely ask for picture ID and check[ ] to see [if] that person is on the list of those authorized to pick up that particular student.* Students are then called to the office[,] where they are signed out. Any student who leaves early must be signed out through the office.

(Emphasis supplied.) Moreover, Cotton showed that the Troup County Board of Education's "Administrative Regulations, Dismissal Precautions" contained the following relevant directions for "Early Dismissal" of students:

1. When a child leaves school early, a note, stating the time of departure and the reason for leaving, should be sent to the office. . . .

4. Occasionally, divorced parents or other relatives request permission to take a child from school. When the other parent has been given legal custody of the child, principals must be very tactful. *In case there is [a] question about the right of the parent or relative to take the child from school, the principal is justified in requesting the person to show evidence that he/she has legal custody of the child or permission of the legal guardian.*

5. *A pupil should never be released to an unidentified person.*

(Emphasis supplied.)

The testimony of two of the assistant principals at LaGrange High School, Kimberly Parks and Kenneth Redding, supports a finding that the policies and procedures of both the high school and

the school board are mandatory rules to be followed by all school employees. According to Parks, the rules require school employees in charge of checking students out of school to check the identification of a person picking up a student and to verify that the person is listed in the student's master file as being authorized to do so. Parks testified that the purpose of the rules is to protect the school's students, stating that, even though 14-year-old students are in high school, they still sometimes do "foolish things," so the rules are designed, in part, to protect them from the consequences of their foolishness. Redding agreed that the rules require school employees to always check the identification of an adult who is trying to check out a student and to check the student's file to see if the adult is authorized to do so. He also admitted that the rules are designed to protect the students.

In contrast to the assistant principals' testimony, the school principal, Cole, testified that, notwithstanding the plain language of the provisions at issue, he believed school employees still had the discretion, based upon their personal judgment of the circumstances, to decide whether to ask an adult to show a driver's license or other identification before allowing the adult to check a student out of school. According to Cole, the same was true regarding the provision directing the school's office staff to check the student's master file before allowing the student to leave with an adult, although Cole also admitted that the provision is a security feature intended to protect the students that was promulgated under his leadership. And, even though Cole asserted that school employees may rely on their personal judgment when deciding whether to check a student's master file before releasing the student to an adult, he admitted that, if an employee *does* check the student's file and the list of authorized people *does not* include the adult's name, the student *will not* be allowed to leave school with the adult. Moreover, Cole admitted that he, as the principal and a school administrator, had a duty to protect the school's students from sexual predators, including 14-year-old students who are legally incapable of consenting to any sexual activity, even if they want to. Ultimately, in an apparent contradiction of his previous deposition testimony, Cole admitted that the provisions quoted above were, in fact, "rules" governing the release of students from his school.

Similarly, Smith initially testified that, although the above-cited rules and regulations were in place in September 2008 and she was familiar with them, in her opinion, the prescribed actions were *not* mandatory and she was authorized to use her personal judgment and discretion when deciding whether to release a student to an adult. Smith also admitted that, despite the county's rule that "students should never be released to an unidentified person," she did not

routinely request identification from adults who were checking out students. Smith explained that, according to her personal interpretation of the rule, a man who tells her that he is a student's father is not "unidentified," so she could use her discretion when deciding whether to allow him to check the student out of school. Smith also admitted that she normally did not check the school's computerized list of people authorized to check out each student, contending that the only purpose for the list is "if there is a reason to question that person[,] in my judgment." Smith contradicted herself during her deposition, however, when she admitted that the county's policy that "[o]ffice staff will routinely ask for picture ID and check[ ] to see [if] that person is on the list of those authorized to pick up that particular student[ ]" was, in fact, a rule that she was supposed to follow.

After considering the evidence and the parties' arguments, the trial court found that Smith's responsibilities in releasing students from school were discretionary and that, because there was no evidence that Smith acted with malice, she was entitled to summary judgment on the basis of official immunity. We disagree.

> Under Georgia law, public officials are immune from damages that result from their performance of discretionary functions, unless those functions were undertaken with malice or intent to cause injury. Absent malice or intent to injure, which are not alleged here, public school officials and employees may be held personally liable only for the negligent performance of ministerial acts. . . . [A] ministerial duty is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty, while a discretionary duty requires the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way *not specifically directed.* . . . [Courts] must distinguish between "rule making or deliberation" in a supervisory capacity and "a specific task which became necessary after the discretionary decision" was made. The execution of a specific task is characterized as ministerial even though the manner in which it is accomplished is left to the employee's discretion.

(Citations and punctuation omitted; emphasis in original.) *Smith v. McDowell*, 292 Ga. App. 731, 733 (666 SE2d 94) (2008). Further, "[t]he determination of whether an action is discretionary or ministerial depends on the character of the specific actions complained of, not the general nature of the job, and is made on a case-by-case

basis." (Citation and punctuation omitted.) *McDowell v. Smith*, 285 Ga. 592, 594-595 (678 SE2d 922) (2009), affirming *Smith v. McDowell*, supra.

In *Smith v. McDowell*, a case with facts similar to the instant case, a school employee allowed the noncustodial father of a six-year-old girl to check the child out of school, even though the girl's school information card did not list him as being authorized to check her out of school and he was not authorized to have any contact with the child due to his previous abduction of her. 292 Ga. App. at 732. The school's receptionist, McDowell, was supposed to check the child's information card to verify that the person picking up the child was authorized to do so and, if the card did not list the person who was seeking to check out the child, she was supposed to consult a school administrator before releasing the child, even if she had received a note or a fax from a parent. Id. at 732-733. In November 2005, McDowell received a telephone call and a fax from a woman posing as the child's mother, instructing McDowell to release the child to her father. Id. at 732. When the father arrived, McDowell asked for and received an identification card from him confirming his name. Id. McDowell could not find the child's information card, however, and she failed to consult an administrator. Id. McDowell simply called the child's teacher, who sent the child to the office. Id. The child recognized her father and seemed happy to see him, and McDowell allowed them to leave the school together. Id. The child's mother then sued McDowell for negligence.

In concluding that McDowell's duties "present[ed] a clear example of a ministerial function," *Smith v. McDowell*, 292 Ga. App. at 734, this Court rejected the employee's argument that "her decision not to follow the [school] policy [on releasing students during the school day] constituted gathering facts and exercising her judgment." Id. at 733. This Court explained that the

application of that argument . . . requires the conclusion that a school employee is "gathering facts" even when following the simplest instructions[,] and that failure to follow such instructions constitutes "exercising judgment." Under that view, any school employee who *disobeys* an explicit, unambiguous written policy would be exercising discretion in doing so. This stands the plain language of the law on its head. As the Supreme Court of New Hampshire observed, "it would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of

> some discretion in the manner of its performance, even if it
> involved only the driving of a nail."[6]

(Punctuation omitted; emphasis in original.) Id. at 733-734. After acknowledging that "a de facto absolute immunity for school employees has developed gradually across the last decade" in the state, id. at 734, and after distinguishing several cases on their facts, this Court criticized the "effective elimination of ministerial acts on the part of school employees" and opined that "[t]here should be no special category of absolute immunity for school employees." Id. at 735-736.

> On the one hand, the General Assembly requires that
> parents entrust their small children to the public schools,
> unless they have the resources to educate them privately or
> at home. OCGA § 20-2-690.1. On the other hand, our courts
> increasingly allow school employees to avoid responsibility
> for all harm to the children placed in their custody by law.
> At some point, this accelerating trend must come to a halt.
> Otherwise, the most flagrant failure to follow *any* school
> policy, no matter how plainly and unambiguously stated, is
> "discretionary" and therefore without legal consequences.
> Such a decision abrogates the constitutional right of citizens
> to seek redress for injuries inflicted by the ministerial acts
> of school employees, especially upon young children who are
> not capable of caring for themselves or exercising judgment.
> If Georgia school employees are to be clothed with absolute
> immunity under any and all circumstances, that is a deci-
> sion to be made by the Georgia General Assembly; it is not
> the function of this, or any, court.

(Emphasis in original.) Id. at 736-737.

Ultimately, this Court concluded that "there was a hard and fast policy with no exceptions, a policy which explicitly allowed for no discretion"; that McDowell's conduct "constitute[d] not one, but two violations of absolute and ministerial duties"; and that McDowell "failed to act in a way that was specifically directed." *Smith v. McDowell*, 292 Ga. App. at 734. In affirming this Court's decision, the Supreme Court of Georgia agreed with these conclusions, stating that

> McDowell was not called on to exercise personal judgment,
> examine facts, reach reasoned conclusions or act in a way

---

[6] (Citations and punctuation omitted.) *Hacking v. Town of Belmont*, 143 N.H. 546, 552 (736 A2d 1229) (1999).

not specifically directed. On the contrary, she was merely required to execute specific duties as dictated by the school checkout policies. . . . [Thus, because] McDowell's mandated actions were simple, absolute and definite, and required the execution of specific tasks without any exercise of discretion, we conclude that they were ministerial functions.

(Citations omitted.) *McDowell v. Smith*, 285 Ga. at 593-594.

In the instant case, the trial court attempted to distinguish *Smith v. McDowell* on its facts by noting that the child in that case was in first grade, while N. F. was in high school, and that McDowell had admitted that she had no discretion regarding whether to check the student's information card to see if the adult was authorized to pick up the child from school.

(a) The age gap between the children, however, is a distinction without a difference, particularly given the testimony in this case that the school is responsible for protecting all of its students, that the applicable rules are intended, at least in part, to protect the students, and that 14-year-old students still need some protection because they are sometimes "foolish."[7] Thus, the analysis of *Smith v. McDowell*, as well as the Supreme Court's opinion in *McDowell v. Smith*, applies in this case and mandates a conclusion that N. F. was entitled to the same protections as the younger child, specifically, protections in the form of a few simple, ministerial acts to be performed before releasing the child to an adult.

(b) Further, the trial court erred in relying upon the testimony of Cole and Smith when distinguishing this case from *Smith v. McDowell*, and in concluding, as a matter of law, that Smith was authorized to use her personal judgment in deciding whether to follow the applicable rules and that, as a result, her duties were discretionary, not ministerial. As shown above, both Cole and Smith contradicted themselves to some extent when questioned about whether the applicable rules mandated certain acts to be performed before releasing a student from school.

Under *Prophecy*,[8] a trial court that is faced with a party's self-contradictory sworn testimony on a material fact should disregard the portions of that testimony that favor

---

[7] In addition, it is undisputed that both six-year-old children and fourteen-year-old teenagers are legally required to attend school and are legally incapable of consenting to any sexual contact. See OCGA § 20-2-690.1 (mandatory school attendance for children between the ages of six and sixteen); see also OCGA §§ 16-6-3 (statutory rape); 16-6-4 (a) (child molestation); 16-6-5 (a) (enticing a child for indecent purposes).

[8] *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 30 (2) (343 SE2d 680) (1986).

the party when deciding a motion for summary judgment, unless the party offers a reasonable explanation for the contradiction.

*CSX Transp. v. Belcher*, 276 Ga. 522, 523 (1) (579 SE2d 737) (2003). Neither Cole nor Smith offered an explanation for the change in their characterization of the rules from discretionary to mandatory. Accordingly, the trial court should have disregarded the favorable portions of their testimony to the extent such testimony was contradicted by their other admissions.

(c) Moreover, given the evidence presented, including the text of the applicable rules and the admissions of witnesses that school employees were required to follow the rules, the trial court erred in finding that there were no express rules that mandated certain ministerial acts by Smith. In fact, the evidence, when viewed in favor of Cotton, as the nonmovant, demands an alternate conclusion: that there were applicable explicit, unambiguous, written rules that required school employees to perform a few simple, ministerial acts before releasing a student to an adult.

As shown above, the school's student planner contained a provision that, in order to be released early from school, a student must present a "parent note, doctor appointment note, court appearance summons, or other certified documentation . . . to the attendance clerk at the time of check out," that the "note must have a phone number whereby the [student's] parent can be reached by an administrator for verification," and that "[s]tudents without a note will not be granted permission to leave . . . [unless they are] signed out by a parent or guardian." (Emphasis omitted.) As written, this provision places clear, simple, affirmative duties on both the student and the front desk employee responsible for checking the student out of school: the student must present a note that meets the provision's requirements, and the employee must either confirm that the student has the note or that a parent or guardian[9] is present to sign the student out. Both Smith and Cole admitted that compliance with this provision was *mandatory*, not discretionary.

In addition, as shown above, the county school board's regulations stated affirmatively that school employees should never release a student to an unidentified person, and the school system's Emergency Preparedness Plan requires employees to ask all visitors for

---

[9] Although Smith stated during her deposition that Hardy told her that he was N. F.'s "father," she also repeatedly admitted that she had no memory of her contact with Hardy or N. F. on September 3 or anything that Hardy said at that time. See footnote 2, supra. Thus, Smith's contradictory testimony on this issue must be construed against her and cannot support a grant of summary judgment in her favor. *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. at 30 (2).

identification if they do not know them and to routinely ask any adult seeking to check a student out of school to show a picture ID and to check to see if that person is on the list of those authorized to pick up that particular student. Given the admissions by Cole and the assistant principals that compliance with these rules was mandatory, Smith's assertions that, in her opinion, Hardy was not "unidentified" due to his verbal identification of himself as "Frank F___," and that "routinely" does not mean that employees must check an unfamiliar adult's identification every time, are insufficient to establish, as a matter of law, that her duties under the rules were discretionary, as opposed to ministerial.[10]

Further, Smith deposed that she believed she was only required to check a student's master file to see if an adult was authorized to check the student out if, based upon her subjective assessment of the situation, she thought it was necessary. However, Parks, one of the assistant principals, testified that, during a conversation after the September 3 incident, she heard Smith say that, with 1,400 students in the school, the front office is always "hectic" and that she (Smith) could not go to the computer and check every student's file before letting the student leave school. This testimony supports an inference that Smith's decision on whether to check a student's computer file was, at least part of the time, based on how busy she was at the moment and not, as she claimed, on her personal assessment of all of the surrounding circumstances.[11]

Given this evidence, as well as the other admissions regarding the mandatory nature of this rule, the trial court erred in finding that *Smith v. McDowell* was sufficiently distinguishable on its facts from the instant case so that it was not bound by the precedent expressed therein.

Accordingly, the evidence, viewed in favor of Cotton, as the nonmovant, demonstrates that Smith's failure to take affirmative actions that were specifically directed in the applicable rules in order to ensure that Hardy was authorized to check N. F. out of school constituted at least two violations of absolute and ministerial duties, just as in *Smith v. McDowell*. Therefore, the trial court erred in concluding, as a matter of law, that Smith's duties were discretionary, not ministerial, and that she was entitled to official immunity,

---

[10] See also Merriam-Webster Dictionary, www.merriam-webster.com (2011), defining "identity" as "the condition of being the same [as] something described or asserted"; "identify" as "to establish the identity of"; and "routine" as "a regular course of procedure[;] . . . habitual or mechanical performance of an established procedure[.]"

[11] Notably, Parks also testified that, as long as the front office computer is working properly, "it [does not] take long at all" to check a student's master file to see if an adult is on the authorized persons list.

and in granting summary judgment to her on that basis.

3. Cotton also argues that the trial court erred in ruling that, even if Smith was not protected from liability on the basis of official immunity, Cotton's claims must fail due to the lack of proximate causation of N. F.'s injuries. In so ruling, the trial court concluded that "Hardy's intervening criminal acts were the proximate cause of [the] alleged injury to [N. F.]," and that "Hardy's criminal act was not a reasonably foreseeable consequence of [Smith's] conduct since [N. F.] testified that she voluntarily left [school] with Hardy."

> Generally, an independent, intervening criminal act of a third party, without which the injury would not have occurred, will be treated as the proximate cause of the injury superseding any negligence of the defendant, *unless the intervening criminal act is a reasonably foreseeable consequence of the defendant's negligent act*. In other words, the intervening criminal act of a third party, without which the injury would not have occurred, breaks the causal connection between the defendants' negligence and the injury unless the criminal act was a reasonably foreseeable consequence of the defendants' conduct.

(Citations and punctuation omitted; emphasis supplied.) *Brown v. All-Tech Investment Group*, 265 Ga. App. 889, 893-894 (1) (595 SE2d 517) (2004). Stated differently,

> if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act. The rule that an intervening and independent wrongful act of a third person producing the injury, and without which it would not have occurred, should be treated as the proximate cause, insulating and excluding the negligence of the defendant, would not apply if the defendant had reasonable grounds for apprehending that such wrongful act would be committed. . . . Moreover, *it is axiomatic that questions regarding proximate cause are undeniably a jury question and may only be determined by the courts in plain and undisputed cases*.

(Citations, punctuation and footnote omitted; emphasis supplied.)

*Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 686-687 (2) (572 SE2d 533) (2002). See also *Zwiren v. Thompson*, 276 Ga. 498, 500 (578 SE2d 862) (2003) ("What amounts to proximate cause is undeniably a jury question and is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent.") (citations and punctuation omitted).

In this case, the evidence presented, when viewed in favor of Cotton, presents a jury issue on whether Hardy's molestation of N. F. was a reasonably foreseeable consequence of Smith's failure to perform her ministerial duties under the circumstances presented. A jury would be authorized to find that Smith could have prevented N. F. from leaving with Hardy — and, in fact, would have been *required* to prevent N. F. from leaving until she could consult with an administrator — if she had fulfilled even one of her ministerial duties.[12] A jury would also be authorized to find not only that Hardy's molestation of N. F. was a reasonably foreseeable consequence of negligently releasing the 14-year-old girl to an unidentified, unrelated, and unauthorized 52-year-old man, but that the school's rules at issue here were *specifically intended*, at least in part, to avoid that very consequence.[13]

Accordingly, the trial court erred in finding that there was no evidence of proximate cause and in granting summary judgment to Smith on that basis.

*Judgment affirmed in part and reversed in part. Miller, P. J., and Doyle, J., concur.*

DECIDED JULY 1, 2011.

*Mayer & Harper, Randolph A. Mayer, Mark Harper*, for appellant.

*Hall, Booth, Smith & Slover, Kenneth D. Jones, Kevin A. Leipow*, for appellees.

---

[12] We note that, contrary to the trial court's ruling, the fact that N. F. testified that she "voluntarily" left with Hardy does not demand a different conclusion, as N. F. was legally required to be in school and, thus, was unable to consent to leaving *at all* without the authorization of her mother and the school.

[13] Cf. *Wright v. Ashe*, 220 Ga. App. 91, 92-95 (469 SE2d 268) (1996) (A high school student enrolled in summer school left the school campus without the school's permission or knowledge and rode as a passenger in a friend's truck. The student was killed when the friend lost control of the truck and hit a tree. This Court affirmed the grant of summary judgment to the school officials, concluding that, even if the officials were negligent in their supervision of the students, the student's injuries were directly caused by the unforeseeable criminal act of the driver and the officials' negligence was, at most, a remote cause of the student's injuries.).