**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**July 31, 2012**

# In the Court of Appeals of Georgia

A12A0705. GREENWAY v. NORTHSIDE HOSPITAL, INC. d/b/a
    NORTHSIDE HOSPITAL et al.

BOGGS, Judge.

Michael Greenway appeals from the trial court's order granting summary judgment to Northside Hospital ("Northside"), Sheriff Ted Paxton, Deputy Terry Roper, and NALAA Corporation ("NALAA"). He contends genuine issues of material fact exist with regard to the liability of each appellee for the euthanasia of his dogs while he was admitted as a patient at Northside. For the reasons explained below, we affirm the trial court's grant of summary judgment to Sheriff Paxton and reverse the trial court's grant of summary judgment to Deputy Roper, Northside, and NALAA.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. OCGA § 9-11-56 (c). On appeal from the grant or denial of summary judgment, we apply a de novo standard of review and view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

So viewed, the record shows that Michael Greenway was taken to Northside by ambulance on January 19, 2007.[1] Greenway recalled telling emergency personnel that his "dogs are in the back yard, they will be fine." His neighbor, Donald Green, talked with EMT and police personnel in Greenway's home and told them that he "would look after the dogs. . . ." According to Green, he "had an understanding" with Greenway that he "would help [Greenway] take care of these two dogs whenever he needed me." After Greenway left for the hospital, Green immediately fed and watered the dogs and observed that "they never approached their food in a manner one would associate with starving dogs."

---

[1] As a result of a work injury in 2001, Greenway is totally disabled, receives social security benefits, and takes numerous medications to manage his pain, anxiety, and difficulty sleeping.

Greenway testified that when he arrived at the hospital emergency room, he "didn't know what was going on. I didn't know, you know, where I was. My space orientation was not good. I didn't know, just didn't know what was going on." He recalled "total chaos," and a nurse saying "he's not going to make it" because his blood pressure was so low. At some point, a patient advocate met with him in the emergency department and asked whether someone else was at his home, and Greenway "said no, except my two dogs." He believed the first mention of his dogs was after the patient advocate arrived. He denied asking anyone to call county officials about his dogs and "didn't understand why the patient advocate would even have called anybody." He explained that he was "out of it" and did not know how much time passed before deputies came into the room with a patient advocate. Greenway was "baffled why the police were even there." He thought three deputies in uniform came into the room, but it "may have only been two and they just kept going around." Greenway testified that "the whole room was full of people."

The deputies asked Greenway to sign a form, but no one could find his glasses. Greenway testified that he "is almost totally blind without [his] glasses," and explained that he needs them to read. He refused to sign the form because he could not read it without his glasses. He asked that it be read to him and someone said "they

couldn't read it to me, by law." Greenway testified that he repeatedly said, "I'm not signing this form until somebody tells me what the h**l what it is I'm signing."

According to Greenway, the nurses and a doctor told him, in the presence of the deputies and the patient advocate, the purpose of the form was that if he "did die, then [his] dogs would go to the Humane Society." The doctor told him that Forsyth County has a policy that you can get your animals back within seven days. Greenway claimed that "[t]hey found out later that it's actually 10 days." Greenway could not recall the deputies correcting information provided to him by hospital personnel and he believed they were present when the statements were made. The only thing he could recall the deputy saying was "[j]ust sign the damn form." He recalled a doctor telling the deputies "either get this form signed or get out of here because you're not sterile." Greenway testified that the doctor also told him "sign the form to get these guys out of here."

Greenway testified that he could not believe he was being asked to sign the document "when I was so out of it," and admitted that he ultimately signed it without reading the entire document. He was able to read the large type words "Owner Release Form" at the top of the form and acknowledged that someone told him the

reason he was giving up ownership was his medical condition. Greenway testified that his signature is the only thing written by him on the form.

Based on information provided to him in the emergency room, Greenway testified that he believed his animals were going to the Humane Society and that, if he lived, he would be able to get them back within seven to ten days. At another point in his deposition, Greenway testified that the "[o]nly reason I turned over the dogs is because they told me I was dying." He explained that he understood his animals were going to the Humane Society and that he would never have signed the form if he had known they would be taken to the pound.

According to Greenway, the only actions he could recall being taken by the deputies in the emergency room was: (1) ordering him to sign the release and (2) placing a big "X" beside the line where he needed to sign. He believes they said other things to him, but he does not "remember what all they said."

At some point after he signed the form, Greenway received his glasses. He read the form, discovered that his animals could be euthanized, and "bells, whistles and everything went off" in his mind. Before he could do anything about what he had signed, he was sedated. When he woke up in a regular hospital room, he talked with the charge nurse about getting his dogs back. After she made some inquiries, she

5

returned with tears in her eyes and informed Greenway that his dogs had already been euthanized.

Greenway testified that he holds the patient advocate responsible for the death of his dogs because the patient advocate contacted the police. He also testified that when the medical personnel volunteered information about the seven to ten day time period in which he could seek the return of his dogs, he expected them to provide him with correct information.

While the deputies and hospital personnel provided very different accounts of their interaction with Greenway, we must view the facts in the light most favorable to Greenway, the non-movant, and we therefore summarize only portions of their deposition testimony. Northside's patient registration clerk testified that she completed admission paperwork for Greenway and wrote "unable to sign" on his admission paperwork. Although she could not recall the specific reason he did not sign the paperwork, she acknowledged that it was possible he was unable to communicate with her.

Northside's patient relations representative, Jeffrey Hancock, testified that he was called by a nurse, Nickie Stockel, who informed him that "[s]he had a patient in the emergency room who was concerned about the welfare of his pets and wanted to

know if [he] could come over to the room." When Hancock arrived, Stockel "introduced [him] to Mr. Greenway, told [him] what was going on, and said, do you think that we should call Animal Control or the Humane Society and see if there's some way they could help." Hancock did not recall Greenway saying anything about not having fed his dogs. According to Hancock, Greenway denied having any friends or family or neighbors who could take care of the dogs. Hancock acknowledged that he did not look for any emergency contact information in Greenway's hospital records.

Hancock testified that he didn't "know what the exact relationship is between Animal Control and Humane Society. The first point of contact is generally Animal Control." At the time he talked with Stockel, he thought that "the Forsyth County Animal Control and the Forsyth County Humane Society [were] the same organization." During his deposition, he repeatedly mispoke and said Humane Society when he intended to refer to Animal Control, and he admitted several times that he did not know if they were the same organization.

After his first meeting with Stockel and Greenway in the emergency room, Hancock returned to his office and called Forsyth County Animal Control. He admitted that Greenway never asked him to call Animal Control after their first

meeting. After several conversations with Greenway and Animal Control about different options available to Greenway, Hancock "advised [Greenway] that the only option for Animal Control at this point was to pick the dogs up and for them to be turned over to Animal Control permanently." He believed he said "Animal Control" to Greenway, but admitted that he "can't say for sure." When Greenway "said he did not want to do that," Hancock left the emergency room. A short time later, Stockel called and told him Greenway had changed his mind and wanted "to turn the dogs over to Animal Control."[2] Hancock testified that he did not know what would happen to the dogs after they were permanently turned over to Animal Control.

Stockel testified that Greenway was not lucid when he first came into the emergency room, explaining that "[h]e would talk, and then he would go back out and then he would talk." According to Stockel, Greenway was concerned about his dogs and whether he had fed them, asked to speak to Hancock "for emotional support," and asked Hancock to call the Humane Society to make sure his dogs were alive. She was certain that Greenway used the words Humane Society, not Animal Control. But, according to Stockel, the Humane Society and Animal Control are one entity.

---

[2] Hancock admitted that he almost said Humane Society instead of Animal Control in this quoted sentence.

Stockel testified that no one from the sheriff's department spoke with Greenway; she testified that "[t]he Humane Society, Officer Roper" spoke with Greenway about his dogs. She explained that she normally asks who is coming into one of her patient's rooms and testified that Officer Roper told her, "my name is Officer Roper, I work with the Humane Society." Her notes in Greenway's medical chart "reflect that Officer Roper worked for the Humane Society." She admitted that she was not familiar with the document signed by Greenway.

Deputy Roper testified that he does not know what happens to any animal after they are turned over to the shelter or whether they typically survive. He admitted that he does not normally tell a person signing a release that there is a possibility their dog might be put to sleep unless "they specifically ask me." Instead, he "tell[s] them there's a chance they're adopted and there's a chance they won't be adopted." He recalled Greenway "being reluctant that he didn't want to release his animals," but denied that Greenway refused to sign the release. He admitted telling Greenway that if he did not have friends or relatives who could care for the animals and could not afford to pay for their care in a shelter or with a vet, "the only other option is the owner release to the shelter so someone can take care of his animals." He also told

Greenway "[t]here has to be something that had to be done. We couldn't just let the animals stay home by themselves without food and water."

The record shows that after Deputy Roper obtained the signed release from Greenway, he and Deputy Rogers went to Greenway's home where they found the dogs in the back yard. Deputy Roper testified that he did not notice whether food and water was available to the dogs, but the dogs appeared to be in good shape. A sheriff's department "field activity record" states that "[w]ith signed receipt, we entered house and obtained dogs. Took to shelter 1 male and 1 female yellow lab and released to shelter." This report makes no mention of any aggressive behavior by the dogs, and Deputy Roper did not testify that the dogs were aggressive when he picked them up.

Deputy Rogers did not speak with Greenway at the hospital and did not recall many details of the day. He nonetheless testified that he believed there were two dogs at Greenway's house, "and I believe the dogs were aggressive toward the officer. That's all I really remember." He did not "recall a lot of detail, but I recall as we approached the fence, of course, the dogs were coming at us aggressively. It appeared that the other officer wasn't able to get control of them by himself."

Defendant NALAA operated the County Animal Control facility through a contract with Forsyth County. It took possession of the animals on January 19, 2007 after they were delivered by the sheriff's department, along with the release signed by Greenway. This release states:

> I, the undersigned, do hereby certify that I am the owner or duly authorized agent for the owner, of animal described above, that I do hereby give Forsyth County Animal Control, their agents, staff, or representatives full and complete authority to destroy and dispose of said animal in a humane manner and hereby release Forsyth County Animal Control from any and all liability for so destroying the said animal.
>
> I understand the said animal may be euthanized (put to sleep) immediately upon my release of animal to Forsyth County Animal Control, if not considered adoptable because of health reasons, temperament, animal's age, lack of space, or if the animal has bitten someone or another animal, or has a history of biting, or any other reason.
>
> If you have carefully read the information above, and your animal(s) has not bitten a human or another animal within the last ten (10) days or has a history of biting, and you have owned the animal for thirty days or more, you may want to consider the various rescue groups available.

11

NALAA was also provided with a document releasing the dogs from the sheriff's office to them stating: "This animal may be adopted or Euthanized as deemed necessary by the Animal Shelter Operator."

On January 22, 2007, three days after Greenway signed the release, NALAA "euthanized both of the animals pursuant to the authority given to the Shelter by Forsyth County." Before euthanizing Greenway's dogs, "[t]he shelter observed that the animals were extremely aggressive and out of control, including, but not limited to slamming their bodies into the front doors of their runs, and it appearing that the animals were going to seriously injure themselves or people. . . ."

Greenway's neighbor, Green, provided an affidavit in which he averred that he called the "county pound" and "spoke with a young lady who worked there." He explained that he had to leave on a business trip, but would provide them with $100 to pay for boarding and food for Greenway's dogs and would pay more money if necessary. He told the woman "over and over again that those dogs were not to be euthanized under any circumstances." The lady responded "that they 'would take real good care of the dogs.' She said that [Green] should not worry about their safety, since they would be given plenty of food, water, and love. [Green] was told there was no need for [him] to provide any financial support for them to take care of

[Greenway]'s dogs." Green promised "that if they needed more money, [his] wife would bring the money since [he] was leaving on a business trip."

When Green returned from his business trip, he learned the dogs had been euthanized and that the director of the pound, Mrs. Orr, had not been informed of his offer of $100 to ensure that Greenway's dogs would not be euthanized. According to Green, Mrs. Orr admitted that the dogs would "probably not" have been euthanized if she had learned about Green's conversation with the woman on the phone.

Greenway subsequently filed a suit against Northside, Forsyth County, and Dr. Lanier Orr DMV d/b/a Orr Animal Hospital. He subsequently obtained the trial court's permission to add Sheriff Ted Paxton and Deputy Terry Roper as defendants, and the trial court's order granting the motion to add them as parties notes that "Forsyth County is no longer a defendant in this case." NALAA Corporation was subsequently substituted as a defendant in the place of Lanier Orr, DMV d/b/a Orr Animal Hospital.

Following discovery, all defendants moved for summary judgment. In his response to Northside's motion for summary judgment, Greenway asserted an ordinary negligence theory of recovery against the hospital in both his written brief and during the hearing on Northside's motion. The trial court granted the summary

13

judgment motions of all defendants. It concluded that Northside could not be held liable under an ordinary negligence theory of liability[3] because: (1) Greenway had not asserted negligence in his complaint or amended complaint and (2) he could not establish proximate cause resulting from Northside's negligence even if he had asserted a negligence claim.

1. Greenway contends the trial court erred by granting summary judgment in favor of Sheriff Paxton and Deputy Roper based upon their immunity from suit for discretionary acts. It appears from his brief that Greenway is asserting that Deputy Roper can be held liable for ministerial acts, that no immunity exists for discretionary acts performed with malice by Deputy Roper, and that Sheriff Paxton should be held vicariously liable for the conduct of Deputy Roper.

Whether a government official is entitled to official immunity is a question of law for the court to determine. *Glass v. Gates*, 311 Ga. App. 563, 575 (2) (716 SE2d 611) (2011).

> The doctrine of official immunity offers public officers and employees
> limited protection from suit in their personal capacity. Official immunity

---

[3] In a previous ruling on Northside's motion to dismiss Greenway's complaint for failing to attach an expert affidavit, the trial court ruled that Greenway was "not seeking to recover for professional malpractice."

14

protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption. Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure. The rationale for this immunity is to preserve the public employee's independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight.

(Citations, punctuation and footnote omitted.) *Todd v. Brooks*, 292 Ga. App. 329, 330 (1) (665 SE2d 11) (2008). "The determination of whether an action is discretionary or ministerial depends on the character of the specific actions complained of, not the general nature of the job, and is to be made on a case-by-case basis." (Citation and punctuation omitted.) *Vann v. Finley*, 313 Ga. App. 153, 159 (1) (721 SE2d 156) (2011).

A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

15

*Todd*, supra, 292 Ga. App. at 330 (1). "Where there is an established policy requiring an official to take specified action in a specified situation, the policy creates a ministerial duty on the part of the official to perform the specified task." (Citation, punctuation and footnote omitted.) *Barnard v. Turner County*, 306 Ga. App. 235, 238 (1) (701 SE2d 859) (2010).

(a) Greenway contends that Deputy Roper's acts were ministerial based upon Deputy Roper's alleged testimony that "all his actions in regard to this situation were following the policy of Sheriff Paxton." A review of the deposition testimony cited by Greenway shows that Deputy Roper testified that he had conversations with police supervisors after the incident and he was informed that his actions were "within policy." Deputy Roper also testified that he made the decision, on his own and as a matter of his own discretion, to provide the release form to Greenway to sign. There is no evidence that Deputy Roper was ordered or obligated to seek Greenway's signature on the release form. Based upon these facts, the trial court properly concluded Deputy Roper's "decision to ask [Greenway] to sign the release for his two dogs" was "discretionary" and one which required "Deputy Roper to exercise personal deliberation and judgment." See *Todd*, supra, 292 Ga. App. at 330-331 (1) (officer's decision to shoot bull during attempted impound discretionary act).

16

This is not the end of our analysis, however, as Greenway's complaint against Deputy Roper is not based solely upon Deputy Roper's decision to ask Greenway to sign the form – instead it also focuses upon the manner in which Deputy Roper executed that decision. In this case, Deputy Roper's act of handing the form to Greenway and asking him to sign it was ministerial; it was a "simple, absolute, and definite [act] . . . requiring merely the execution of a specific duty." (Citation, punctuation and footnote omitted.) Id. at 330 (1). The allegations that Deputy Roper exercised poor judgment in carrying out that act do not make the act the type of discretionary act protected by official immunity; they merely support an inference of negligence. See *Hicks v. McGee*, 289 Ga. 573, 577 (1) (713 SE2d 841) (2011) ("The fact that appellants failed to [correctly perform a ministerial duty] cannot serve to change the nature of the [act] in any manner.") Greenway's assertions that Deputy Roper told him, "Just sign this d**n form," and that Deputy Roper did so when he was "out of it" and "under medication" create genuine issues of material fact as to whether he breached a ministerial duty. The trial court therefore erred by granting summary judgment in Deputy Roper's favor based upon official immunity.

(b) Having found issues of fact precluding summary judgment in favor of Deputy Roper, we must now determine whether Sheriff Paxton may be held

17

vicariously liable for Deputy Roper's conduct under the doctrine of respondeat superior. A sheriff may be held liable for a deputy's negligence only to the extent the county has waived sovereign immunity. *Seay v. Cleveland*, 270 Ga. 64, 65 (1) (508 SE2d 159) (1998); *Gilbert v. Richardson*, 264 Ga. 744, 753-754 (7) (452 SE2d 476) (1994). A county's sovereign immunity "may only be waived by a legislative act which specifically provides that sovereign immunity is waived and the extent of such waiver." (Citations, punctuation and footnote omitted.) *Smith v. Chatham County*, 264 Ga. App. 566, 567 (1) (591 SE2d 388) (2003). "A waiver of sovereign immunity must be established by the party seeking to benefit from the waiver." (Citation and footnote omitted.) Id. In this case, Greenway points to no applicable statute waiving the county's sovereign immunity and has consequently failed to meet his burden. We therefore affirm the trial court's grant of summary judgment in favor of Sheriff Paxton.

2. Greenway asserts the trial court erred in granting summary judgment in favor of Northside because genuine issues of fact exist with regard to Northside's liability for ordinary negligence. Although Greenway's complaint and amended complaints did not assert a negligence theory of recovery, we may consider it because it is raised by the evidence before us, Greenway argued it below, and the trial court ruled upon

18

it. See *Hamburger v. PFM Capital Mgmt.*, 286 Ga. App. 382, 376 (1) (b) n. 14 (649 SE2d 779) (2007); *Deloach v. Foremost Ins. Co.*, 147 Ga. App. 124, 125 (1) (A) (248 SE2d 193) (1978).

In order to recover against the hospital for ordinary negligence, Greenway must show: "(1) a legal duty to conform to a standard of conduct; (2) a breach of this duty; (3) a causal connection between the conduct and the resulting injury; and (4) damage. . . ." *Pattman v. Mann*, 307 Ga. App. 413, 417 (701 SE2d 232) (2010). In this case, in analyzing the hospital's duty of care, we must consider whether Northside voluntarily undertook a duty for which it may be held liable. *Osowski v. Smith*, 262 Ga. App. 538, 540 (1) (586 SE2d 71) (2003).

> [O]ne who undertakes to do an act or perform a service for another has the duty to exercise care, and is liable for injury resulting from his failure to do so, even though his undertaking is purely voluntary or even though it was completely gratuitous, and he was not under any obligation to do such act or perform such service, or there was no consideration for the promise or undertaking sufficient to support an action ex contractu based thereon. When one undertakes an act that he has no duty to perform and another person reasonably relies upon that undertaking, the act must generally be performed with ordinary or reasonable care. Id. The person assuming such responsibility may be held liable for negligently performing the duties so assumed.

19

(Citations and punctuation omitted.) Id.

In this case, genuine issues of material fact exist as to whether Northside voluntarily undertook a duty to help Greenway ensure the safety of his dogs during his hospitalization, to provide advice about the effect of the release he signed, to advise him about the entity employing Deputy Roper, and to advise him about which entity would be taking custody of his dogs if he signed the release. Questions of fact also exist as to whether Northside negligently performed any duties so assumed by its conduct in calling Animal Control instead of the Humane Society and providing inaccurate information to Greenway about Deputy Roper's employment, the entity which would take custody of his dogs, and the effect of the release.

Northside contends that, even if it did breach a duty owed to Greenway, "the property damages at issue are simply too remote from any conduct attributable to the hospital to support any recovery against it." It asserts "multiple intervening actions" preclude a finding that any negligence on its part proximately caused the death of his dogs.

"The question of proximate cause is usually reserved for the jury and can be decided on summary judgment only in plain and indisputable cases." (Citation and punctuation omitted.) *Vann v. Finley*, supra, 313 Ga. App. 153, 161 (2) (721 SE2d

20

156) (2011). Summary judgment should not be granted on the issue of proximate cause unless "reasonable persons could not differ as to both the relevant facts and the evaluative application of legal standards (such as the legal concept of foreseeability) to the facts." (Citation and punctuation omitted.) Id.

> It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act or omission of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury.

(Citation omitted.) *Textile Rubber & Chemical Co. v. Thermo-Flex Technologies*, 308 Ga. App. 89, 98 (2) (c) (706 SE2d 728) (2011). But,

> "if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequence could reasonably have been anticipated, apprehended, or foreseen by the original wrongdoer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.

*Cotton v. Smith*, 310 Ga. App. 428, 440-441 (3) (714 SE2d 55) (2011).

21

In this case, the evidence presented, when viewed in favor of Greenway, presents a jury issue on whether the euthanization of Greenway's dogs was a reasonably foreseeable consequence of Northside's conduct in seeking the assistance of Animal Control, as opposed to the Humane Society, in addition to its conduct in providing inaccurate information to Greenway about the effect of the release, Deputy Roper's employment, and the entity which would take custody of his dogs. See id. (holding jury issue existed as to whether school's conduct in releasing student to unauthorized person was proximate cause of her subsequent molestation by this person); *Daniel v. Bank South Corp.*, 183 Ga. App. 274, 276-277 (358 SE2d 664) (1987) (finding jury issue as to whether bankruptcy and foreclosure damages were proximately caused by bank's failure to provide accurate credit information to another lender from whom the plaintiff sought a loan for his real estate activities). The owner release form signed by Greenway expressly provided that Greenway's dogs could be euthanized and issues of fact exist as to whether the hospital's employees made representations to Greenway about the content and effect of the waiver form before Greenway signed it.

Northside also asserts that a judicial admission made by Greenway mandates summary judgment in its favor on the issue of proximate cause. In a brief filed in

opposition to Sheriff Paxton and Deputy Roper's motion for summary judgment, Greenway contended: "Officer Roper lied to [his] attending nurse and said he was with the Humane Society. The Plaintiff believed Officer Roper's lies and this was the sole reason that he signed the release." This statement in Greenway's brief does not alter the proximate cause analysis with respect to Northside because it is not inconsistent with his deposition testimony that hospital personnel informed him that his animals would be going to the Humane Society. Greenway's brief does *not* contain an admission that Officer Roper lied directly to Greenway, but instead asserts that Officer Roper lied to the nurse. This assertion is consistent with Stockel's testimony that the officer told her that he was with the Humane Society. Because issues of fact exist as to whether hospital personnel told Greenway about Deputy Roper's alleged employment with the Humane Society and issues of fact exist as to whether they may have miscommunicated or misunderstood Deputy Roper's employment affiliation, the statement in Greenway's brief does not mandate summary judgment in favor of the hospital on the issue of proximate cause.

3. In his remaining enumeration of error, Greenway asserts the trial court erred by granting summary judgment in favor of NALAA, the private entity operating the Forsyth County Animal Control shelter on behalf of the county. In his complaint,

23

Greenway alleged an agreement had been reached between his neighbor, Green, and a representative answering the phone on behalf of the pound operated by Dr. Orr. In opposition to NALAA's summary judgment motion, Greenway submitted an affidavit from Green outlining the agreement Green had reached with a woman working at the pound for the safe-keeping of Greenway's dogs. During the summary judgment motion hearing, Greenway also relied upon this agreement to oppose NALAA's motion for summary judgment.

Although inartfully pled and argued both below and here on appeal, Greenway's pleadings appear to assert a claim for promissory estoppel.[4] Under the

---

[4] Greenway's complaint consists of 125 numbered paragraphs with a general prayer for relief at the end. While the caption states it is a "Complaint for Cruelty to Animal, Trespass, Deprivation of Personalty, Interference with Chattel, Invasion of Privacy, and Punitive Damages," the body of the complaint contains no counts or theories of recovery. The facts alleged in the complaint fall within the elements of a promissory estoppel claim, and it is clear that Greenway seeks to recover damages from NALAA based upon the promise it made to his neighbor and agent, Green. Greenway asserted that this promise precluded summary judgment in NALAA's favor in his written brief below and during the summary judgment hearing, and he also relies upon it in his brief to this court. "[C]omplaints and other pleadings should be construed as to do substantial justice, that is, liberally in favor of the pleader." (Citation and punctuation omitted.) *Dudley v. Wachovia Bank*, 290 Ga. App. 220, 225 (2) (659 SE2d 658) (2008). "The well established rule in Georgia is that, under our system of notice pleading, the substance, rather than the nomenclature, of legal pleadings determines their nature. [Cit.]" *Cotton v. Fed. Land Bank*, 246 Ga. 188, (269 SE2d 422) (1980).

doctrine of promissory estoppel a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." OCGA § 13-3-44 (a). "Promissory estoppel is an equitable doctrine designed to prevent the intricacies and details of the law from frustrating the ends of justice." (Citation, punctuation and footnote omitted.) *Sun-Pacific Enterprises. v. Girardot*, 251 Ga. App. 101, 106 (2) (553 SE2d 638) (2001). The elements of promissory estoppel are:

> (1) the defendant made a promise or promises; (2) the defendant should have reasonably expected the plaintiffs to rely on such promise; (3) the plaintiffs relied on such promise to their detriment; and (4) an injustice can only be avoided by the enforcement of the promise, because as a result of the reliance, plaintiffs changed their position to their detriment by surrendering, forgoing, or rendering a valuable right.

(Citation omitted.) *Rental Equip. Group v. Maci, LLC*, 263 Ga. App. 155, 157 (1) (b) (587 SE2d 364) (2003).

In this case, the following facts create genuine issues with regard to Greenway's promissory estoppel claim: Greenway and his neighbor Green "had an understanding that [Green] would help him take care of [the] dogs whenever . . .

needed;" Greenway heard his neighbor assure him that he would "take good care of your dogs" before he was transported to the hospital; Green "told the police and EMT's that [he] would look after the dogs;" Green contacted the county pound on Greenway's behalf and obtained a promise that the dogs would not be euthanized;[5] and Green left on a business trip and took no further action to protect the dogs' safety in reliance upon this promise.

While the releases provided to NALAA may have authorized it to euthanize Greenway's dogs, it was also authorized to subsequently enter into a promise *not* to do so.[6] And, Greenway, as a principal, would be entitled to damages suffered as a result of representations made to his authorized agent acting on his behalf to protect the well-being of his dogs.[7] After construing every inference in favor of the

---

[5] Mrs. Orr's subsequent statement that the promise would have been honored had she been aware of it supports an inference that the employee was authorized to make such a promise on behalf of NALAA.

[6] The release signed by Greenway did not include a merger clause or a prohibition against subsequent oral amendments.

[7] See OCGA § 10-6-1 ("The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf."); OCGA § 10-6-53 ("The form in which the agent acts is immaterial; if the principal's name is disclosed and the agent professes to act for him, it will be held to be the act of the principal."); OCGA § 10-6-58 ("Notice to agent of any matter connected with his agency shall be notice to the

26

nonmovant from the record before us, we conclude that genuine issues of material fact exist as to whether NALAA can be held liable for the euthanization of Greenway's dogs based upon the theory of promissory estoppel. We must therefore reverse the trial court's grant of summary judgment in NALAA's favor.

*Judgment affirmed in part, reversed in part. Doyle, P. J. concurs. Andrews, J., concurs in judgment only.*

---

principal."); OCGA § 10-6-62 ("The principal shall have advantage of his agent's contracts in the same manner as he shall be bound by them, so far as they come within the scope of his agency.")