**SECOND DIVISION**
**MERCIER, C. J.,**
**MILLER, P. J., and HODGES, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**February 26, 2024**

# In the Court of Appeals of Georgia

A23A1609. AMOS et al. v. CREATIVE CONSULTING SERVICES, INC. et al.

MILLER, Presiding Judge.

In this tragic wrongful death action, Chante Amos, as the administrator of her daughter Janae Michelle Amos' estate, appeals from the trial court's order granting summary judgment to Creative Consulting Services, Inc., and Yvette Walcott (collectively "CCS"). On appeal, Amos argues that the trial court erred by granting CCS' motion for summary judgment because genuine issues of material fact remain on her negligence claims. After a careful review of the record, we conclude that genuine issues of material fact remain on Amos' negligence claims, and we therefore reverse the trial court's order granting summary judgment to CCS.

Summary judgment is proper if the pleadings and evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. On appeal from a trial court's grant of summary judgment, we conduct a de novo review, construing all reasonable inferences in the light most favorable to the nonmoving party.

(Citation omitted.) *Trico Environmental Svcs., Inc. v. Knight Petroleum Co.*, 357 Ga. App. 826, 827 (849 SE2d 538) (2020). We emphasize that "[t]he party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact." (Citation omitted.) *Johnson v. Omondi*, 294 Ga. 74, 75 (751 SE2d 288) (2013). And we have long held that "[i]f there be any conflict in the evidence as to some material fact even within the testimony of the same witness the granting of a summary judgment is not proper." *Griffin v. Bremen Steel Co., Inc.*, 161 Ga. App. 768, 770 (2) (288 SE2d 874) (1982). See also *Montgomery v. Barrow*, 286 Ga. 896, 898 (1) (692 SE2d 351) (2010) (stating that where "there are *bits of evidence* in the record which create genuine issues of material fact . . . summary judgment is not appropriate[.]") (emphasis supplied).

So viewed, the record shows that Creative Consulting Services, Inc., provides support coordination and intensive support coordination services for individuals with developmental disabilities.[1] The role of a support coordinator is to oversee and monitor the direct services that a provider gives to a client and to visit with their assigned client on a monthly or quarterly basis. Individuals who are serviced by Creative Consulting receive funding from the Georgia Department of Behavioral Health and Developmental Disabilities ("DBHDD"), which establishes rules, regulations and oversight "for the care of the client in need." DBHDD "expects," and Creative Consulting requires, support coordinators to use the Individual Quality Outcome Measure Review ("IQOMR"), which is a document containing more than 50 questions to evaluate quality of the care being provided to the client. The questions include:

(20) Are all staff knowledgeable about all information contained within the individual's ISP?[2]

---

[1] Creative Consulting, however, does not directly provide care to any of its clients.

[2] "ISP" stands for individual service plan, which is a plan that is tailored for each individual client based on the client's particular needs.

3

(23) Are all staff knowledgeable about all of the individual's healthcare plans?

(24) Are indicated healthcare plans being implemented?

(28) Are all physician/clinical recommendations being followed?

(29) Are all prescribed medications being administered, as ordered, and documented accurately?

(30) Are all required assessments/evaluations completed?

(31) Has the individual had any hospital admissions, emergency room, or urgent care visits since the last review?

(35) Are supports and services being delivered to the individual, as identified in the current ISP?

Creative Consulting's executive director testified that as part of the support coordinator's completion of the IQOMR, the support coordinator was "expected" to review the documents kept by the provider. DBHDD's rules also provide that support coordinators "[r]eview any pertinent documentation" related to the IQOMR questions. The executive director also testified that as part of the support

coordinator's completion of the IQOMR, the support coordinator was expected to examine documentation relating to the facility's staffing.

When conducting monitoring visits of a client, DBHDD's rules authorize a support coordinator to issue a coaching or referral if any issues or concerns are found in the provider's care after completing the IQOMR questions. A coaching is an instruction given to a provider to correct an issue or deficit in care. A referral occurs when a provider has not complied with the coaching, or if the support coordinator identifies an "urgent risk of a non-clinical nature" and the plan to correct the deficit is insufficient compared to the urgency of the risk. DBHDD then reviews the referral and takes additional action if necessary.

Creative Consulting was the support coordination agency since 2006 for Janae Amos, Chante Amos' daughter, and Walcott, who was employed by Creative Consulting, was Janae's support coordinator and visited Janae on a monthly basis to "oversee her care." In 2018, Janae was 23 years old, was developmentally disabled, and was diagnosed with cerebral palsy, failure to thrive, epilepsy, and scoliosis. She was also nonverbal, nonmobile, and incontinent; she needed constant care and assistance with "everything." Walcott knew that Janae had a prior incident of

aspiration, and Janae's ISP required a thickener, "Thick-It," to be added to her liquids to prevent her from choking which could lead to aspiration and death.

On October 7, 2018, Janae was moved from her home to Dolly's Personal Care Home, Inc. ("DPC"), a community residential alternative group home. Walcott visited Janae at a day program hosted by DPC on October 15, 2018, and she subsequently visited Janae at DPC on October 27, 2018. Walcott stated that DPC did not have many records regarding Janae because she had recently moved into the home, but Walcott did not observe any issues or detect any problems that would have required her to issue a coaching or a referral. Walcott also stated that she reviewed Janae's records and all of the documentation present at DPC, that Janae's Medical Administration Record ("MAR") was up to date, that Janae's ISP, which required that two people assist with lifting and transferring Janae and that Thick-It be added to all of her liquids, was present at the home, and that the staff informed her that Thick-It was being given to Janae. Laura Morgan, a residential technician at DPC who was responsible for attending to the residents at the home, signed Janae's ISP and affirmed that she had been trained on Janae's ISP and would comply with the information contained therein. Morgan later stated, however, that she never used

Thick-It in Janae's liquids or medication and that "no one ever told her about it." Moreover, although Walcott deposed that it would "concern" her if DPC did not document the administration of Thick-It to Janae and that she would ordinarily check a facility's records for this information, she could not recall whether she reviewed DPC's documentation pertaining to Thick-It. Specifically, when pressed as to whether she checked DPC's records for the administration of Thick-It to Janae, Walcott responded, "when I visit, unless I see it, if they say we're putting it in there, that is what I go by. She was not being fed at the time or drinking anything at the time of the visit so that would not be something that I would hone in on right away." Walcott also acknowledged that, although her role as a support coordinator authorizes her to examine the records kept by a facility regarding a client, she could not recall whether she asked to review all of DPC's records regarding Janae.

On November 20, 2018, Morgan, the only staff member present at DPC that evening, fed Janae and gave her juice to drink between 6:30 p.m. and 7:00 p.m., and put her to bed around 8:00 p.m. Morgan checked on Janae around 8:40 p.m. and saw that she "was sleeping and ok." When Morgan checked on Janae again at 9:20 p.m., she was unresponsive and vomit covered her nose and mouth, and Morgan called 911.

EMS personnel responded to the home and observed Janae lying in a supine position in bed and that Morgan was not performing CPR. EMS personnel then moved Janae to the floor and began manual CPR compressions. When questioned by EMS personnel, Morgan could not advise of Janae's medical conditions, nor could she explain Janae's general health, medications, or whether a Do Not Resuscitate (DNR) existed. Janae was taken by ambulance to a hospital, where she was admitted to the intensive care unit and treated for aspiration pneumonia, but she died the next day. Janae's cause of death was listed as myocardial arrest as a consequence of respiratory failure due to aspiration pneumonia, and her death was classified as natural. Due to Janae's passing, Walcott was unable to complete a monthly review for November 2018.

DBHDD conducted a clinical mortality investigation on December 21, 2018, and as part of its investigation, it compiled a report regarding Janae's care during her time at DPC. DBHDD also reviewed DPC's residential services progress notes from October 7, 2018, to November 20, 2018, which contained documentation concerning Janae's meals during that time period. It conducted interviews with DPC's residential technicians who cared for Janae, specifically confronted them for not documenting

any administration of Thick-It to Janae, and concluded that DPC was deficient for failing to document this information. DBHDD also noted that Janae's ISP required that her liquids be mixed with Thick-It, and that after Janae's visit with her primary care doctor on October 31, 2018, he ordered that Thick-It be used in her medications. DBHDD found, however, that Janae's MAR was not updated after her October 31, 2018 visit with her primary care doctor, and that seven doses of Robitussin were given to her between November 12, 2018, and November 19, 2018, without Thick-It. Additionally, DBHDD noted that Morgan admitted that she "did not mix Thick-It in the water or juice" before giving it to Janae, and it found that four other staff members failed to administer Thick-It properly. DBHDD further found that although DPC's staff were required to check a resident every 30 minutes, the staff did not follow this policy. DBHDD ultimately concluded that the actions of DPC's staff constituted neglect[3] because of the failure to use Thick-It as proscribed by Janae's physicians and her ISP.

---

[3] DBHDD's policy defines "neglect" as "the failure to provide goods and services necessary to avoid actual or potential physical or medical harm, mental anguish, or mental illness."

Amos filed suit against Creative Consulting, Walcott, DPC, and DPC's owner and general manager,[4] alleging wrongful death, negligence, negligence per se, punitive damages, and estate claims against all of the defendants. CCS answered the complaint and subsequently filed a motion for summary judgment, which the trial court granted following a hearing. Specifically, the trial court determined that there was no evidence to show that CCS' actions or omissions proximately caused Janae's death and that no genuine issues of material fact remained. This appeal followed.

1. First, Amos argues that the trial court erred by granting summary judgment on her negligence claims because genuine issues of material fact remain as to whether CCS' failure to observe and correct the deficiencies in DPC's records proximately caused Janae's death. Specifically, Amos argues that CCS' failure to discover discrepancies and missing information in DPC's records pertaining to the administration of Thick-It, DPC's staffing shortage, and DPC's routine bedtime checks proximately caused Janae's death. We agree in part, and conclude that genuine issues of material fact remain as to whether CCS' failure to discover discrepancies and

---

[4] Amos settled the action against DPC and its owner and general manager, and therefore they are not a part of this appeal.

missing information in DPC's records pertaining to the administration of Thick-It proximately caused Janae's death.[5]

"To state a cause of action for negligence, a plaintiff must establish the following essential elements: (1) a legal duty; (2) a breach of this duty; (3) an injury; and (4) a causal connection between the breach and the injury." (Citation omitted.) *ABM Aviation v. Prince*, 366 Ga. App. 592, 595 (1) (884 SE2d 8) (2023). Additionally, we have been clear that "[n]egligence is not actionable unless it is the proximate cause of the injury." (Citation omitted.) *Ga. Dept. of Transp. v. Owens*, 330 Ga. App. 123, 130 (2) (766 SE2d 569) (2014).

---

[5] Amos' claim regarding DPC's bedtime checks was not preserved for appellate review because she did not argue below that the issues concerning the bedtime checks created a genuine issue of material fact in her written response to CCS' motion for summary judgment or at the hearing on the motion. And "we do not apply a 'wrong for any reason' rule to reverse incorrect rulings on issues not raised or ruled upon in the trial court." (Citation omitted.) *Alston & Bird, LLP v. Mellon Ventures II, L.P.*, 307 Ga. App. 640, 648 (6) (b) (706 SE2d 652) (2010). Moreover, Amos' claim regarding the alleged understaffing at DPC fails to create a genuine issue of material fact. We have not uncovered any evidence in the record that DPC was required to have more than one staff member present at the home at all times. Also, Janae's ISP did not require her to be under constant care and supervision by two staff members. Instead, Janae's ISP merely required that two staff members assist with lifting and transferring her, and we note that DBHDD did not determine that DPC was deficient in this area or that the understaffing was connected in any way to Janae's death.

Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred. In this regard, a negligent actor who breaches a duty to another is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience.

(Citations and punctuation omitted.) *Johnson v. Avis Rent A Car System, LLC*, 311 Ga. 588, 592 (858 SE2d 23) (2021). And, we have noted that "there may be more than one proximate cause of an injury in cases involving the concurrent negligence of several actors." (Citation omitted.) *Orr v. SSC Atlanta Operating Co.*, 360 Ga. App. 702, 709 (2) (860 SE2d 217) (2021). Moreover, "'probable,' in the rule as to causation, does not mean 'more likely than not' but rather 'not unlikely'; or, more definitely, such a chance of harm as would induce a prudent man not to run the risk; such a chance of harmful result that a prudent man would foresee an appreciable risk that some harm would happen." (Citation and punctuation omitted.) *Johnson*, supra, 311 Ga. at 592. Furthermore, the Supreme Court of Georgia has emphasized that foreseeability, as it relates to proximate cause, focuses on "the incident causing the injury as opposed to the foreseeability of the injury." (Citation, punctuation, and emphasis omitted.) *Ga.*

*CVS Pharmacy, LLC v. Carmichael*, 316 Ga. 718, 734 (2) (D) (1) (890 SE2d 209) (2023).

> The requirement of proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons, e.g., intervening act, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery. The determination of whether proximate cause exists requires both factfinding in the 'what happened' sense, and an evaluation of whether the facts measure up to the legal standard set by precedent.

(Citations and punctuation omitted.) *Johnson*, supra, 311 Ga. at 593. "And it is generally a jury question as to whether or not such negligence proximately caused the injury." (Citation omitted.) *Mercy Housing Ga. III, L.P. v. Kaapa*, 368 Ga. App. 270, 274 (1) (b) (888 SE2d 346) (2023).

Applying the aforementioned legal principles, we conclude that genuine issues of material fact remain as to whether Walcott's failure to observe the discrepancies in DPC's records regarding the use and administration of Thick-It proximately caused Janae's death. Importantly, we first note that CCS has conceded that "the failure to administer Thick-[I]t proximately caused [Janae's] death," and that DPC's failure to administer Thick-It in accordance with the ISP "led to [Janae's] death. Thus, by this

13

admission, CCS concedes that a causal connection exists between the failure to administer Thick-It in accordance with the ISP and Janae's death. Second, we note that there is evidence in the record that DPC was required to document the administration of Thick-It to Janae based on DBHDD's finding that DPC was deficient for failing to do so. Specifically, as stated above, DBHDD reviewed DPC's progress notes from October 7, 2018, to November 20, 2018, which contained documentation concerning Janae's meals during that time period, and it confronted DPC's staff for not documenting *any* administration of Thick-It to Janae, and concluded that DPC was deficient for failing to document this information. Moreover, Walcott knew of a prior incident in which Janae aspirated and knew that Thick-It needed to be added to Janae's liquids to keep her from choking, and Walcott admitted that documentation regarding the administration of Thick-It is something that she would look for as part of her review of a client's care. Yet when questioned as to whether she checked DPC's records specifically for this information, Walcott merely stated, "unless I see it, if they say we're putting it in there, that is what I go by[,]" *and that she did not "hone in" on whether Thick-It was being given to Janae at the time of her visit because Janae was not being fed or drinking anything at that time.* Additionally,

14

Creative Consulting's executive director specifically testified that a support coordinator was "*expected*" to review all of a provider's records as part of the support coordinator's completion of the IQOMR, and one of the questions in the IQOMR *specifically* asks whether "supports and services" were being delivered to the client as required by the ISP. And, the record is clear that Janae's ISP required that Thick-It be added to her liquids to prevent her from choking, which could lead to aspiration and death. Thus, there is some evidence that Walcott did not conduct a proper review of Janae's records to specifically check for documentation regarding the use and administration of Thick-It to Janae. And, in light of DBHDD's finding that DPC did not document *any* information regarding the use and administration of Thick-It to Janae while she resided at DPC, there is also some evidence that Walcott would have discovered the deficiencies in DPC's records concerning the Thick-It if she had conducted a proper review, which would have required her to do a coaching or referral that may have corrected the issues regarding the use and administration of the Thick-It before such issues led to Janae's death. Given this evidence in the record, *albeit conflicting*, and CCS' concession that the failure to use Thick-It in accordance with the ISP led to Janae's death, we conclude that genuine issues of material fact remain as

15

to whether Walcott's failure to observe the discrepancies in DPC's records concerning the administration of Thick-It proximately caused Janae's death. See *Mercy Housing Ga. III,* L.P., supra, 368 Ga. App. at 275 (2) (a) (trial court properly denied the defendants' motion for summary judgment on causation element in a wrongful death action, where the evidence showed that the defendants were required, but failed to install an emergency call device, and the evidence showed that the victim would have been rescued sooner had the device been provided to the victim); *Vann v. Finley*, 313 Ga. App. 153, 161-162 (2) (721 SE2d 156) (2011) (genuine issues of material fact remained as to proximate cause where the evidence showed that the defendant would have discovered that smoke detectors were not installed in a mobile home if he had conducted a required inspection, and the victims would have likely survived the fire if smoke detectors had been installed); *Purcell v. Breese*, 250 Ga. App. 472, 475 (1) (552 SE2d 865) (2001) (defendant not entitled to summary judgment in wrongful death action where the defendant, who had treated the victim for hallucinations and suicide attempts, was aware that the victim was at risk for committing suicide and discharged him from the hospital without speaking to him or

16

reviewing the most recent entries in his records which revealed that the victim "constantly" thought about suicide).

Moreover, we reject CCS' claim that Morgan's negligence was an intervening act that extinguishes their liability.

> [U]nder the well-established doctrine of intervening causes, a defendant's breach of a duty does not constitute a proximate cause of a plaintiff's injury when there has intervened between the act of the defendant and the injury to the plaintiff, an independent act or omission of someone other than the defendant, which was not foreseeable by the defendant, was not triggered by the defendant's act, and which was sufficient of itself to cause the injury.

(Citation and punctuation omitted.) *Maynard v. Snapchat, Inc.*, 366 Ga. App. 507, 509 (883 SE2d 533) (2023). Still, we have been clear that the intervening act

> does not insulate the defendant if the defendant had reasonable grounds for apprehending that such wrongful act would be committed. Stated differently, if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences *could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer*, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.

17

(Citation omitted; emphasis supplied.) Id. at 511. Moreover, we have been clear that "[t]he foreseeability analysis is not that specific: the relevant inquiry is not whether the exact intervening negligent act was foreseeable, but whether, as a general matter, the original negligent actor should have anticipated that this general type of harm might result." (Citation omitted.) *Granger v. MST Transp., LLC*, 329 Ga. App. 268, 271 (1) (764 SE2d 872) (2014).

Here, the record is clear that the role of a support coordinator was to provide "*oversight monitoring*" of direct services that a provider gives to a client. And, in monitoring the services provided to a client, a support coordinator was required to review a provider's documentation as part of the support coordinator's completion of the IQOMR, and one of the questions in the IQOMR specifically asks whether "supports and services" were being delivered to the client as required by the ISP. If the support coordinator discovered issues in the provider's care after conducting a review, the support coordinator was to issue a coaching or a referral to address and correct the deficits in the client's care. Pertinently, Walcott specifically testified that documentation regarding the administration of Thick-It is something that she would look for as part of her review of a client's care, but she admitted that she did not

18

"hone in" on whether Thick-It was being given to Janae at the time of her visit because Janae was not eating or drinking anything at that time. Because Walcott was required to monitor DPC, review its documentation about the use and administration of Thick-It, and take corrective actions if there were deficiencies in the provider's care, we conclude that Walcott could have reasonably anticipated or foreseen DPC's failure to provide the proper care to Janae. See *Cotton v. Smith*, 310 Ga. App. 428, 441 (3) (714 SE2d 55) (2011) (fact issue remained as to whether the victim's molestation was an intervening act that extinguished the school employee's liability for releasing the victim to an unidentified convicted felon, because a jury could have concluded that the molestation would not have occurred if the employee had performed her administrative duties properly); *Coleman v. Atlanta Obstetrics & Gynecology Group, P.A.*, 194 Ga. App. 508, 510-511 (1) (390 SE2d 856) (1990) (doctor's negligent act of performing a therapeutic abortion was not an intervening act that extinguished the original doctor's negligent injection of a hormone into the plaintiff that "started the chain of events"). Thus, CCS' claim that Morgan's negligence was an intervening act necessarily fails. And for the reasons stated above, because there is conflicting evidence as to whether CCS performed a proper review of Janae's care at DPC, we

are constrained to conclude that genuine issues of material fact remain as to whether CCS' failure to discover deficiencies in DPC's records regarding the administration of Thick-It proximately caused Janae's death.[6]

2. Amos further argues that the trial court erred by granting summary judgment because genuine issues of material fact remain on her negligence claims as to whether CCS breached a legal duty of care to Janae. We agree and conclude that genuine issues of material fact remain as to whether CCS breached a legal duty of care.[7]

(a) As to Amos' ordinary negligence claim, as stated above, a cause of action for negligence requires, in part, a breach of a legal duty of care. *ABM Aviation*, supra, 366 Ga. App. at 595 (1). In this case, CCS concedes that they owed Janae a legal duty of care. Therefore, the only remaining issue to be determined is whether CCS breached

---

[6] Although CCS further argues that Amos' negligence claim fails because of a lack of expert testimony, we do not address this claim because CCS did not assert it as a basis for summary judgment below in their written motion or at the hearing. See *Wellons, Inc. v. Langboard, Inc.*, 315 Ga. App. 183, 186 (1) (726 SE2d 673) (2012) ("Appellate courts do not consider whether summary judgment should have been granted for a reason not raised below because, if they did, it would be contrary to the line of cases holding that a party must stand or fall upon the position taken in the trial court.") (citation and punctuation omitted).

[7] We address this claim because the trial court's order also summarily concluded that no genuine issues of material fact remain on Amos' negligence claims.

20

their legal duty of care by examining whether the defendant engaged in improper conduct in relation to the duty of care owed. See *Clary v. Allstate Fire and Cas. Ins. Co.*, 340 Ga. App. 351, 356 (2) (795 SE2d 757) (2017) ("[I]t is not enough for a plaintiff to show that the defendant owed the plaintiff a duty of care; the plaintiff must specify the conduct that constituted a breach of that duty, that is what the defendant did that it should not have done.").

In this case, we conclude that genuine issues of material fact remain as to whether CCS breached their legal duty of care to Janae. As recounted in detail above, there is evidence in the record to show that Walcott was required to review Janae's documentation as part of her monthly review of Janae's care and the completion of the IQOMR, and to ensure that DPC was administering Thick-It in accordance with Janae's ISP. Yet Walcott testified that at the time of her review, she did not "hone in" on whether DPC was administering Thick-It to Janae. In light of this evidence, we conclude that genuine issues of material fact remain as to whether CCS breached a legal duty of care.

(b) As to Amos' negligence per se claim, it is well settled that "negligence per se arises when a statute or ordinance is violated." *Hubbard v. Dept. of Transp.*, 256 Ga.

21

App. 342, 349 (3) (568 SE2d 559) (2002). And, "[t]he violation of certain mandatory regulations may also amount to negligence per se if the regulations impose a legal duty." Id. at 349-350 (3). "When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby." OCGA § 51-1-6. The trial court, however, must first consider "(1) whether the injured person falls within the class of persons [the statute] was intended to protect and (2) whether the harm complained of was the harm the statute was intended to guard against." (Citation and punctuation omitted.) *Hubbard*, supra, 256 Ga. App. at 350 (3).[8]

In this case, we conclude that genuine issues of material fact remain on Amos' negligence per se claim. Specifically, we note that OCGA § 37-1-20 authorizes DBHDD to supervise physical care and treatment, regulate the delivery of care, and provide guidelines and oversight of homes. OCGA § 37-1-20 (1), (2), (12), (17), & (19). And, as recounted above, DBHDD enacted regulations for support coordinators

---

[8] A plaintiff is also required to establish a causal connection between the negligence and the injury. *Hubbard*, supra, 256 Ga. App. at 350 (3). For the reasons stated above in Division 1, we conclude that genuine issues of material fact remain as to proximate cause.

to abide by when reviewing a client's care, including reviewing documentation and issuing a coaching or referral. Furthermore, we conclude that Janae was in the class of persons to be protected. OCGA § 37-1-2 (a) specifically provides that "the state has a need to continually improve its system for providing effective, efficient, and quality mental health, developmental disability, and addictive disease services." Thus, Janae, who was a developmentally disabled woman, clearly falls within the class of persons that the statute was designed to protect. Finally, the harm complained of was the type of harm the statute intended to guard against. As previously stated, OCGA § 37-1-20 vests power in the DBHDD to regulate and oversee care for individuals with developmental disabilities, and to establish and regulate facilities for the treatment of disabilities. Thus, the type of harm that occurred in this case — the failure to oversee the care of a developmentally disabled woman and the eventual death of that woman — is precisely the type of harm that the statute was designed to guard against. Accordingly, we conclude that the trial court erred by determining that no genuine issues of material fact remained on Amos' negligence claims.

In sum, for the foregoing reasons, we reverse the trial court's order granting CCS' motion for summary judgment.

*Judgment reversed. Mercier, C. J., and Hodges, J., concur.*